# In the United States Court of Federal Claims

No. 16-793C

(Filed:  January 31, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **JOHN SHEA,** | Claim for damages under the Fair Labor Standards Act, 29 U.S.C. § 216(b); position as Investigations Specialist with NCIS designated as exempt; frequent duty as a "team lead;" genuine disputes over material facts |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant.** | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Linda Lipsett, Bernstein & Lipsett, P.C., Washington, D.C., for plaintiff.  With her on the briefs and at the hearing were Daniel M. Rosenthal and Alice C. Hwang, James & Hoffman, P.C., Washington, D.C.

David M. Kerr, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Henry Karp, Senior Trial Attorney, Naval Litigation Office, and S. Christopher Mullins, Jr., Assistant Counsel, Civilian Personnel Law, Naval Criminal Investigative Service, Quantico, VA.

## OPINION AND ORDER

LETTOW, Judge.

The salient question in this case is whether plaintiff John Shea, an Investigations Specialist with the Naval Criminal Investigative Service ("NCIS"), was entitled to overtime pay for hours he worked in excess of forty hours per week under the provisions of the Fair Labor Standards Act of 1938, ch. 676, 52 Stat. 1060 (codified as amended at 29 U.S.C. §§ 201-219) ("FLSA"); *see* Compl. ¶ 14.  The NCIS has as its mission "to investigate and defeat criminal, terrorist, and foreign intelligence threats to the United States Navy and Marine Corps—ashore afloat, and in cyberspace." NCIS, Mission Statement *available at* http://www.ncis.navy.mil/pages/publicdefault.aspx (last accessed January 26, 2018).  Mr. Shea alleges that his position, coded by the Office of Personnel Management ("OPM") as GS-1801-12, was wrongfully designated as "FLSA exempt" and that he was consequently "deprived . . . of regularly scheduled overtime and night differential to which he [wa]s entitled."  Compl. ¶¶ 1, 11.  Mr. Shea contends that the government has failed to rebut the FLSA's presumption against

exemption from the Act's overtime pay provisions, and thus that he is entitled to: (1) a declaratory judgment stating that he is not exempt from, but rather, protected by, the FLSA's overtime provisions, and (2) an award of "all back overtime under the FLSA and Title 5 [of the United States Code], night differential and other pay, leave, holiday, and excused and other paid absence compensation, and benefits, interest, and liquidated damages due and owing . . . from 2010 to a date which is not more than 30 days before the date on which the judgment herein is paid." Compl. at 5.  Mr. Shea also seeks attorneys' fees and costs under the FLSA, the Back Pay Act of 1966, Pub. L. No. 89-380, 80 Stat. 94 (repealed and enacted as positive law in Revised Title 5 by Pub. L. No. 89-554, 80 Stat. 378 (relevant back pay provisions currently codified at 5 U.S.C. § 5596)); and the Equal Access to Justice Act, Pub. L. No. 96-481, 94 Stat. 2325 (currently codified, in relevant part and as amended, at 28 U.S.C. § 2412).  Compl. at 5; *see also* Rule 54(d)(2) of the Rules of the Court of Federal Claims ("RCFC") (relating to awards of costs and attorney's fees).

The government controverts Mr. Shea's assertions, arguing that he is exempted from the FLSA's overtime protections because he is an "employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1), and specifically that he falls within the "administrative exemption" of the FLSA.  *See* Def.'s Mot. for Summary Judgment ("Def.'s Mot.") at 2, ECF No. 11; *see also* 5 C.F.R. § 551.206.

The parties each seek partial summary judgment on the issue whether Mr. Shea's position falls within the bounds of the FLSA's administrative exemption and, if Mr. Shea is found to have been wrongfully classified as exempt, whether "the act or omission giving rise to such [misclassification] was in good faith and [whether the government] had reasonable grounds for believing that [the misclassification] was not a violation of the [FLSA]." 29 U.S.C. § 260.[1]  The parties further seek summary judgment as to whether the government's erroneous classification was a "willful violation" such that the FLSA's statute of limitations extends back three years, rather than the two years that otherwise applies in such cases. 29 U.S.C. § 255(a).

In sum, the parties' cross-motions for summary judgment present three primary issues that they ask this court to resolve: (1) was Mr. Shea's position wrongfully classified as exempt from the FLSA such that he is entitled to back pay under the FLSA?; (2) if Mr. Shea were wrongfully classified as exempt, was the erroneous classification decision made with good faith and reasonable grounds such that Mr. Shea is not automatically entitled to an award of liquidated damages?; (3) if Mr. Shea were wrongfully classified as exempt, was the misclassification willful, such that the statute of limitations extends three years instead of two?  The government seeks summary judgment as to all three issues, while Mr. Shea notes that if summary judgment were granted in his favor, further proceedings would be necessary to ascertain the damages to

---

[1] If Mr. Shea is found to have been erroneously classified as FLSA-exempt, he is entitled to "unpaid overtime compensation . . . and . . . an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  But if the government shows that the misclassification was made in good faith and with a reasonable basis, "the court may, in its sound discretion, award no liquidated damages" or some lesser amount of liquidated damages up to the amount of overtime pay to which Mr. Shea is found to be entitled.  29 U.S.C. § 260.

which is he entitled.  *See* Pl.'s Mem. in Opp'n to Def.'s Mot. & Cross-Mot. for Partial Summary Judgment, ("Pl.'s Cross-Mot.") at 29-30, ECF No. 12.

A hearing on the cross-motions was held on December 13, 2017.  For the reasons stated, the court determines that genuine issues of material fact exist as to whether Mr. Shea was wrongly classified as exempt, and the motions of both parties for summary judgment on that issue are accordingly denied.  The same issues of material fact that make resolution of Mr. Shea's misclassification claims inappropriate at this stage likewise preclude resolving the issue of whether NCIS's classification decision was made in good faith and with reasonable basis. The court further determines that the government is entitled to summary judgment on the issue of willfulness.

# BACKGROUND[2]

## A.  Mr. Shea's Job Responsibilities

Mr. Shea entered on duty in his current position as an Investigations Specialist in NCIS's Office of Special Projects in May 2010.  Compl. ¶¶ 1, 7; Def.'s Mot. Ex. 3 (Dep. of John Shea (May 23, 2017) ("Shea Dep.")), at 14.[3]  In this capacity, it is undisputed that Mr. Shea is an "employee of the United States."  Compl. ¶ 4; Answer ¶ 4.  As Mr. Shea puts it, one component of NCIS's mission is counterintelligence, "basically working against spies," and as an Investigations Specialist with the Office of Special Projects, Mr. Shea stated that "[m]y portion of the responsibility is to conduct surveillance.  As far as investigation, I cannot elaborate on that, because that's an agent['s responsibility]."  Shea Dep. at 19.

Mr. Shea is one of a team of ten people in his unit that undertake surveillance missions at the direction of the team supervisor, Mr. Freeman.  *See* Shea Dep. at 19-20.  Mr. Shea testified that the duties he performs vary depending on whether he is in the field on a mission or in the office, and, if he is in the field, whether he is serving as the team lead for that particular mission. *Id.* at 19-21.

Mr. Shea testified that from the latter portion of 2013 through 2016, he spent approximately eighty percent of his time conducting surveillance in the field, and the remaining twenty percent in the office.  Shea Dep. at 56-59.  In 2017, in contrast, Mr. Shea testified that his time was evenly divided between surveillance in the field and non-surveillance time spent in the office.  *Id.* at 55-56.  Mr. Freeman estimated that for calendar year 2016, the surveillance team was in the field for about 300 days of the year, and that this distribution was comparable in the

---

[2]The recitation of facts that follows is taken from the parties' pleadings, their cross-motions for summary judgment, and the documentary materials submitted with the parties' motions.

[3]Citations to the Shea Deposition will be to the page number of the deposition transcript, rather than the numbered page of the exhibit to the government's motion for summary judgment to which it is appended in full.

years prior to 2016.  Pl.'s Cross-Mot., Ex. 1 (Dep. of Dennis Freeman (Apr. 13, 2017) ("Freeman Dep.")), at 62-67.

When case agents—the NCIS law enforcement officers to whom Mr. Shea referred in his deposition—request surveillance support for ongoing investigations, Mr. Freeman selects one of the team members to serve as team lead for that particular mission.  Shea Dep. at 18-21.  Of the ten members of Mr. Shea's team, four, including Mr. Shea, are selected to serve as team lead with any regularity.  *Id.* at 19-21.  Mr. Freeman testified that, of the surveillance team members, Mr. Shea is selected as team lead approximately fifty percent of the time.  Def.'s Mot. Ex. 5 (Freeman Dep., Def.'s Mot. Excerpts), at 32-33 (In response to the question "why does [Mr. Shea] serve as team lead more often than" the next two most common team lead choices, Mr. Freeman said, "[Mr. Shea's] very reliable. He's also a work horse.").[4]  Contrastingly, Mr. Shea testified that, while the share of missions on which he is team lead has increased over time as other team leads have left or retired, he has generally served as team lead on only twenty to thirty-five percent of the missions.  Shea Dep. at 75-76.

The duties of a team lead for a particular surveillance mission begin with meeting with the case agent about the requested surveillance support.  Shea Dep. at 38.  After confirming the mission's objectives, the team lead prepares an "ops plan"—a document that sets forth "the basic information of the mission"—and delivers a briefing to the rest of the team, which lasts, on average, about thirty minutes.  *Id.* at 38-39.  The team lead will also request that one of the team members serve as the mission's note-taker, with responsibility to produce an "Investigation Action," a report describing the events of the mission that is then sent to the agent who requested the surveillance.  *Id.* at 39-41, 73-75.  Mr. Shea testified that he will review the report in about seventy percent of cases in which he is the lead, but that he generally will suggest revisions only, for example, to add a team member's name that was left off the report; he further testified that he did not recall any instance in which either Mr. Freeman or the case agent requested changes to or asked questions about the report.  *Id.* at 73-75.

The team lead will also conduct daily briefings with the surveillance team at the beginning and end of shifts while on a mission, but Mr. Shea testified that "[a]s far as instructing anyone [on how to conduct the surveillance,] there's really no instruction. . . .  [T]here's certain things that the team lead doesn't have to tell you.  [Team members] automatically know . . . what [they] have to do."  Shea Dep. at 101-102.  Mr. Shea indicated that the daily briefings are generally limited to reporting any change in objectives requested by the case agent and discussing alterations to the mission plan "if there's a . . . method that was used that didn't work."  *Id.* at 45.  Mr. Shea testified that he would typically provide periodic updates on the mission's progress to the case agent depending on the agent's preference and to Mr. Freeman typically at the end of each shift—though he noted that Mr. Freeman did not require such updates.  *Id.* at 47-48, 91.  Mr. Shea indicated that disputes among team members as to the proper course of conducting the operation are rare, "[b]ut if . . . it comes down to a decision that has to be made, yes, I guess, ultimately it is the team lead's [decision]."  *Id.* at 46.  Finally, upon

---

[4]Citations to the Freeman Deposition will be to those portions appended to plaintiff's cross-motion, except where the excerpts of that deposition appended to defendant's motion are specifically designated.

conclusion of an operation, Mr. Freeman conducts an after-action briefing that the team—including the team lead—is required to attend if they are not out on another assignment; the team will debrief the mission, discussing any problems that went wrong with communications, equipment, surveillance methods, and so on. *Id.* at 79-80.

Serving as team lead involves some additional and different duties than being a general team member. Mr. Shea estimated that the duties of team lead account for about ten percent of the time he spends on a mission. Shea Dep. at 167 ("90 percent of the time. When I'm the team leader, my day—90 percent of it is conducted—conducting surveillance. 10 percent may be as team leader duties, contacting the agent, finding out . . . if there's any changes, et cetera."). Mr. Freeman, in contrast, estimated the percentage of time spent on team lead duties as reaching as high as forty percent on an average mission. Freeman Dep. at 71. In conjunction with this testimony, Mr. Freeman described the duties of the team lead as initially centering around "[t]he plan of attack. The team lead and I will discuss the plan and after that discussion, we'll determine that we're going to use however many people that we need to use, whatever gear, so I give latitude to the team lead to make those calls . . . . But ultimately, they determine how many people and what they plan on using," which also extends to "controlling . . . the surveillance operation itself." Freeman Dep., Def.'s Mot. Excerpts, at 40-41, 71.

When Mr. Shea is not serving as a team lead, he shares the same surveillance duties as the other team members. He attends the pre-mission briefing led by the assigned team lead, makes his own travel arrangements to the mission site, and ensures that the necessary equipment is functional and mission-ready. Shea Dep. at 42. Mr. Shea notes that he–like all members of his unit–is required to record his own hours and attendance and make travel arrangements for traveling to mission locations. *Id.* at 36, 42.

When in the field, Mr. Shea conducts foot and vehicle surveillance of their assigned target, and attends the team's daily briefings. *See* Shea Dep. at 49. When he is not serving as team lead, Mr. Shea is responsible for selecting the equipment he uses based on the mission's objectives, but is not responsible for determining how long the surveillance should be conducted. *See id.* at 49-50.

As with the rest of the surveillance team, when Mr. Shea is conducting vehicle surveillance, his main responsibility is "[t]o operate in a manner that is not detectible." Shea Dep. at 50-51. When conducting vehicle surveillance, team members could be responsible either for driving or for navigating for another team member who is driving. *Id.* at 51-52. Mr. Shea could be responsible for deciding how close to follow the surveillance target, if the driver, or navigating for the driver, working surveillance equipment if it is deployed, and communicating with the rest of the team, if the passenger. *Id.*

Mr. Shea testified that when he is conducting foot surveillance, his primary responsibility is "[t]o follow an individual on foot and communicate back to [his] team." Shea Dep. at 53-54. Like vehicle surveillance, surveillance on foot requires the exercise of discretion in determining how closely to follow the subject, communicating with the rest of the team, and could include operating surveillance equipment as well, depending on the mission objectives. *Id.* at 54-55.

### B.  Mr. Shea's Receipt of Administratively Uncontrollable Overtime

Mr. Shea testified that his average work week could vary from 40 hours, if he is in the office and has no assigned missions, to 16 hours a day 7 days a week--a 112-hour work week--if he is on a mission and the mission requires it.  *See* Shea Dep. at 123, 132.  Mr. Shea indicated that when he is in the office and there are no surveillance missions, he receives his standard pay with no enhancements or additional payments, but when he is in the field on a surveillance mission, he receives a salary adjustment known as Administratively Uncontrollable Overtime, ("AUO"), which amounts to a twenty-five percent enhancement.  *Id.* at 128, 137.

As Mr. Shea explains it, AUO is a pay-period-based salary enhancement that accounts for hours worked in excess of the standard 40-hour work week that, because of the unpredictable nature of surveillance duties, has been determined not to be susceptible to advance planning and approval.  *See* Shea Dep. at 138-42, 146-47, 151-52.  Rather than attempting to account in advance for the time he would be required to work in excess of 40 hours per week, Mr. Shea records all of the hours he works, *see id.* at 157, and each paycheck includes a twenty-five percent adjustment on top of his regular salary to account for the projected additional time.  *Id.* at 140-45.

AUO payments are reviewed on a quarterly basis, and for pay periods in which Mr. Shea does not record twenty-five percent more hours (*i.e.*, for an eighty-hour pay period, where he does not record 100 hours), his AUO is adjusted to properly account for the amount of overage he actually worked.  Shea Dep. at 145.  Mr. Shea indicated that it is his understanding that he would have no entitlement to AUO during a pay period in which he had no missions and thus worked the standard forty-hour work week, but he also appeared to testify that his AUO adjustment has never been less than the maximum twenty-five percent.  *Id.* at 146.  Mr. Shea also testified that the time requirements of surveillance missions could exceed 125% of his normal work week, essentially meaning that he would be recording hours he worked that would not be accounted for by either his normal salary or the AUO enhancement.  *See id.* at 154.

Mr. Shea testified that he understood that another method of salary enhancement, Regularly Scheduled Overtime, or "RSO," was essentially a counterpart to AUO.  Shea Dep. at 146-47.  Mr. Shea indicated that RSO is used where, "in advance[,] . . . you know that there's going to be overtime, so you can submit to your supervisor for a block of overtime to be . . . claimed during that period."  *Id.* at 146.  Mr. Shea testified that he was not eligible for RSO, because, after asking Mr. Freeman and his field office supervisor about RSO, he was informed by e-mail "basically . . . that because I was on AUO that I didn't qualify for premium [pay]."  *Id.* at 147 (In response to the question "Were you provided with a reason why you were not eligible for RSO other than what [Ms.] Tyree said, because you're on AUO?" Mr. Shea said "[t]hat's the only reason I've gotten.").[5]

---

[5]When asked about any other members of his team he knew to be receiving RSO, Mr. Shea indicated that, around the time he filed his complaint, two more junior, GS-7 and GS-9 level, employees were notified that they were not receiving AUO and instead would be receiving

*C.  NCIS's Classification of Mr. Shea's Position*

Mr. Shea's position was classified as FLSA-exempt in 2007.  *See* Def.'s Mot. Ex. 4 (Dep. of Stacey Cruz (Apr. 26, 2017) ("Cruz Dep.")), at 21.  Ms. Cruz, the Division Chief of the Staffing, Classification, and Compensation Division of NCIS's Human Resources Department, *see* Pl.'s Cross-Mot., Ex. 2 (Cruz Dep. Excerpts),[6] at 10, provided testimony on NCIS's behalf under RCFC Rule 30(b)(6) as to "why NCIS continued to classify Mr. Shea's position as FLSA exempt from July 2013 through the present."  Pl.'s Cross-Mot. Ex. 6, (Letter from David Kerr to Linda Lipsett, (Apr. 11, 2017)); *see also* Pl.'s Cross-Mot. Ex. 5, (Second Amended Notice of Deposition Under Rule 30(b)(6), (Apr. 7, 2017)).  As the government indicated, no current NCIS employee involved in the classification decision in 2007 is still with NCIS, and no documents exist to indicate the factors or evidence considered in reaching the conclusion that Mr. Shea's position is FLSA-exempt.  *See* Pl.'s Cross-Mot. Ex. 6 (Letter from Kerr to Lipsett)).

Ms. Cruz testified that she was a second-line supervisor for job classifications at NCIS, and that, generally, the front-line classifier would classify NCIS job positions in consultation with their first-line supervisor, but if there were still questions about the proper classification, Ms. Cruz would at that point become involved.  Cruz Dep., Pl.'s Cross-Mot. Excerpts, at 12-13.  For use in the classification function, Ms. Cruz indicated that her office has a compilation of statutes, regulations, and decisions by OPM.  *Id*. at 48-49.

When asked to review Mr. Shea's job description, Ms. Cruz indicated that it was in an outdated format, based on the previously applicable National Security Personnel System format that depended upon a narrative description of the job's duties rather than a job description that relied on a time-based breakdown of the job's duties.  *See* Cruz Dep., Pl.'s Cross-Mot. Excerpts, at 27-28.  That system is no longer used.  *Id*. at 29.  Ms. Cruz indicated that if a job were being classified under the process that NCIS currently follows, a time-based breakdown would be required to properly apply the governing statutory and regulatory rules.  *Id*. at 148-49.  Ms. Cruz also indicated that, during an employee's annual performance review, the employee—along with his or her supervisor—examines and addresses, *inter alia*, the employee's job description and must confirm that it still accurately reflects the employee's duties.  Cruz Dep. at 22-23.

## STANDARDS FOR DECISION

A grant of summary judgment is appropriate if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A material fact is one "that might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

RSO, and that, while one of those team members is now back to receiving AUO, the other still receives RSO instead.  Shea Dep. at 155.

[6]Citations to the Cruz Deposition will be to those portions appended to defendant's motion, except when the excerpts of that deposition appended to plaintiff's cross-motion are specifically designated.

(1986).  A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party.  *Id.* at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  RCFC 56(c)(1)(A).  If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The same standard applies when the parties have cross-moved for summary judgment.  *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other."  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).  Rather, the court must evaluate each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.* (citations omitted).

## ANALYSIS

Both parties seek summary judgment on the issue of whether Mr. Shea was misclassified as FLSA-exempt.  If Mr. Shea secures summary judgment, he additionally seeks summary judgment on the issues of whether the misclassification was willful—so as to extend the statute of limitations from two to three years—and whether the misclassification was made in good faith and with reasonable grounds, a finding which is relevant to whether he is entitled to liquidated damages as a matter of right or whether such an award is discretionary.

### I.    WAS MR. SHEA ERRONEOUSLY CLASSIFIED AS FLSA-EXEMPT UNDER THE "ADMINISTRATIVE" EXEMPTION?

The FLSA empowers OPM to promulgate regulations implementing the Act's provisions as they apply to employees of the federal government, *see* 29 U.S.C. § 204(f), and OPM has invoked this authority to adopt regulations located at 5 C.F.R. §§ 551.101 through 551.710.  OPM's regulations are explicit that "[e]ach employee is presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of [the Act's] exemptions," that the exemptions "must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption," and that "[t]he burden of proof rests with the agency that asserts the exemption."  5 C.F.R. § 551.202(a)–(c).  The regulations further provide that "[i]f there is a reasonable doubt as

to whether an employee meets the criteria for exemption, the employee will be designated FLSA nonexempt." *Id.* § 551.202(d).

One of the FLSA's exemptions is for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). OPM's regulations provide context for what types of employees are meant to be included in the executive, professional, and administrative categories. *See* 5 C.F.R. §§ 551.205-.207. The parties agree that neither the "executive" nor the "professional" categories apply to Mr. Shea's position. Thus, at issue here is whether Mr. Shea is exempt under the FLSA's administrative exemption. In relevant part, the regulations provide that "[a]n administrative employee is an employee whose primary duty is the performance of office or non-manual work directly related to the management or general business operations, as distinguished from production functions, of the employer or the employer's customers and whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 551.206. The regulations further clarify that "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 551.206(a).

In short, applying the administrative exemption requires first determining what the employee's primary duty is, and then conducting an analysis of (1) whether the primary duty is directly related to the employer's management or business operations, as distinguished from production functions, (2) whether the primary duty involves the exercise of discretion as to matters of significance, and (3) whether the primary duty involves the performance of office or non-manual work. *See* 5 C.F.R. § 551.206.

### A. Mr. Shea's Primary Duty

The government argues that Mr. Shea's primary duty is "determin[ing] how to do surveillance." Def.'s Resp. & Reply ("Def.'s Reply") at 3, ECF No. 13. This framing of Mr. Shea's primary duty focuses largely on the time Mr. Shea spends serving as team lead, and, as such, the government notes that Mr. Shea "*plans* for the surveillance, *determines* what equipment to use, and then *decides* how to carry out the surveillance." *Id.* (emphasis added). The government further emphasizes Mr. Shea's acknowledgement that "the primary duty of an Investigations Specialist includes *planning, scheduling, and coordinating* the logistical and operational aspects of physical surveillance." Def.'s Mot. at 11 (emphasis added). Other job functions listed on Mr. Shea's position description that the government cites as support for its preferred characterization include "*interpreting and overseeing* agency policy and procedures" and "*help*[*ing* to] develop the agency's surveillance policies and procedures." Def.'s Mot. at 11-12 (emphasis added). Mr. Shea also "*decides* what electronic surveillance devices to bring," and decides "when to begin and end surveillance shifts, by *determining* the subject's 'pattern of life.'" *Id.* at 9-10 (emphasis added).

In short, then, the government conceives of Mr. Shea's primary duty as essentially incorporating the function of processing information and charting the proper course of action, a function the government asserts Mr. Shea is performing even when he is doing what he

characterizes as "covertly follow[ing] and observ[ing] targets of surveillance" because the act of performing surveillance necessarily involves the analytical process of "determining how to carry out surveillance," s*ee* Def.'s Reply at 5, coupled with the function of assisting in the development of agency policy and procedure.

Mr. Shea responds that "[u]nder this logic, any person who does a task that involves decisionmaking (no matter how basic) is actually 'determining how to do' the task." Pl.'s Reply at 3, ECF No. 14. Mr. Shea also disputes the government's contention that his primary duty could be serving as team lead or "'support[ing] agency management by overseeing, interpreting, and developing the agency's surveillance policy.'" Pl.'s Cross-Mot. at 15 (quoting Def.'s Mot. at 16). He notes first that "[t]he record . . . does not contain a single example of [him] participating in any agency policy decision in a substantial manner," and further that there is no evidence "that [he] crafts policy or otherwise participates in policy decisions by conducting surveillance." *Id.* at 15-16.

Mr. Shea likewise submits that "[e]ven if [he] were a full-time team lead, he would still not be an exempt administrator." Pl.'s Reply at 13. Instead, Mr. Shea submits that his primary duty is to surveil—that is, "to conduct surveillance[;] to covertly follow and observe targets of surveillance." Pl.'s Cross-Mot. at 8. Thus, Mr. Shea asserts that the depositions of Mr. Freeman and himself generally indicate that Mr. Shea "spen[ds] most of his time conducting surveillance." *Id.* at 14-15 (quoting Mr. Freeman as indicating that Mr. Shea and the rest of the team "are 'responsible for executing surveillance operations[,]'" . . . [and] "traveling to and from sites of surveillance, 'keeping up with the trade,' and completing employment paperwork" (citing Freeman Dep., at 14-15). Ms. Cruz also testified that "as someone classifying a position, I think it's reasonable to say that more than 50 percent of [Mr. Shea's] time is spent doing investigative work and surveillance." Cruz Dep., Pl.'s Cross-Mot., Excerpts, at 154. Mr. Shea accordingly emphasizes the testimony given both by himself and Mr. Freeman that in 2017, Mr. Shea was in the field on surveillance missions approximately fifty percent of the time, and in past years, that number was higher—approximately eighty percent. *See* Pl.'s Cross-Mot. at 4.

Although Mr. Shea notes the government relies chiefly on certain functions of the team lead role in advancing its framing of his primary duty, he argues that "[he] undisputedly spends a small minority of his time on team lead duties, between 2% and 14% of time in the field." Pl.'s Cross-Mot. at 21. Mr. Shea asserts that he spends approximately ten percent of his time performing team lead functions, and serves as team lead on approximately thirty-five percent (or less) of missions, resulting in approximately two-to-four percent of his time in the field spent on team lead duties. *Id.* at 4-5. This calculation, Mr. Shea argues, cannot support a finding that serving as team lead—which he characterizes as the core of the government's "determining how to do surveillance" framing—is his primary duty. Pl.'s Reply at 5.

The government also alludes to the concept of alternative primary duty for FLSA exemption purposes, apparently in furtherance of an argument in the alternative that Mr. Shea's team lead or policy-centric duties, though not accounting for a majority of Mr. Shea's time on the job, would nevertheless constitute an alternative primary duty. *See* Def.'s Reply at 3-5. OPM's regulations state that "[a] duty constituting less than 50 percent of an employee's work . . . may be credited as the primary duty for exemption purposes provided that duty: (1)

[c]onstitutes a substantial, regular part of the work assigned and performed; (2) [i]s the reason for the existence of the position; and (3) [i]s clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment as discussed in [5 C.F.R.] § 551.206, and the significance of the decisions made." 5 C.F.R. § 551.104. Mr. Shea counters first that the government failed to sufficiently present this argument for this court's consideration, and alternatively that the government has failed to satisfy the elements of that test. *See* Pl.'s Reply at 6.

Under OPM's regulations, an employee's primary duty is "typically . . . the duty that constitutes the major part (over 50 percent) of an employee's work." 5 C.F.R. § 551.104. The government also cites 29 C.F.R. § 541.700(c) for the proposition that, while a duty on which the employee spends more than fifty percent of their time is likely to satisfy the primary duty requirement, "[t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." Def.'s Reply at 4 (quoting 29 C.F.R. § 541.700(c)). Mr. Shea argues, however, that 29 C.F.R. § 541.700, as a regulation promulgated by the Department of Labor ("DOL"), is not binding on the exemption analysis as it applies to federal employees. *See* Pl.'s Reply at 6 & n.6. He cites *Billings v. United States,* 322 F.3d 1328, 1334 (Fed. Cir. 2003), for the proposition that any conflicts between OPM's and DOL's FLSA-implementing regulations, as applied to federal employees, are generally resolved in favor of applying OPM's regulations "unless [they are] unreasonable." Pl.'s Reply at 6 n.6. *Billings* states that "OPM's guidelines must 'harmonize with the statute's "origin and purpose," . . . as well as with the Secretary of Labor's regulations.'" *Billings,* 322 F.3d at 1334 (citing *Zumerling v. Devine,* 769 F.2d 745, 750 (Fed. Cir. 1985)). That decision's treatment of precedent is instructive in parsing circumstances when OPM's regulations applicable to federal employees might diverge from DOL's regulations applicable generally. The overall goal is "to effectuate the consistency of application to both federal and non-federal employees." *Id.*[7]

---

[7]The precedent *Billings* cites—*Zumerling*—itself cites a Supreme Court case that holds only that "[t]he challenged [Internal Revenue Service regulation] is not a reasonable statutory interpretation unless it harmonizes with the *statute's* 'origin and purpose.'" *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26 (1982) (emphasis added).

Instructive is another case, *Adams v. United States*, 40 Fed. Cl. 303 (1998), addressed by *Billings* in providing background for its decision. *Adams* concludes that OPM's regulations must be harmonized with both the FLSA and DOL's regulations and clarifies why DOL's regulations may be relevant to interpreting OPM's regulations. *Adams* noted that when the FLSA was amended in 1974 to cover federal employees and granted OPM the authority to promulgate regulations, a committee report contained the statement that OPM "will administer the provisions of the [FLSA] in such a manner as to assure consistency with the meaning, scope, and application established by the rulings, regulations, interpretations, and opinions of the Secretary of Labor which are applicable in other sectors of the economy." *Id.* at 305 (citing *American Federation of Gov't Emps. v. Office of Prof'l Mgmt.,* 821 F.2d 761 (D.C. Cir. 1987) (quoting Fair Labor Standards Amendments of 1974, H.R. Rep. 93-913, at 28 (1974), 1974 U.S.C.C.A.N. 2811, 2837-38) (alterations in original). Nonetheless, as *Adams* noted, "[a]dverting to the DOL regulations as presumptively the proper interpretation still leaves room for non-identical

Overall, the court concludes that under both OPM's and DOL's regulations, the duties Mr. Shea performs when he serves as team lead are relevant to a consideration of Mr. Shea's primary duty. OPM's regulation indicates that "[p]rimary duty *typically* means the duty that constitutes the major part . . . of an employee's work," 5 C.F.R. § 551.104 (emphasis added), which plainly admits to the consideration of duties an employee performs less than a majority of the time but that are still relevant to the understanding of the employee's day-to-day job duties. A component of Mr. Shea's job that he performs regularly, therefore, could contribute to the suite of responsibilities that comprise Mr. Shea's day-to-day work, notwithstanding the fact that, at a certain level of granularity, he does not perform any one specific task more than fifty percent of his time. As Mr. Shea submits, "[i]n identifying a primary duty, a court should review 'the actual day-to-day activities of the employee.'" Pl.'s Cross-Mot. at 12 (quoting *Schaefer v. Ind. Mich. Power Co.,* 358 F.3d 394, 400 (6th Cir. 2004)).

The focus of the parties' briefing on the primary-duty issue is essentially a dispute over how Mr. Shea's periodic role as team lead fits into the analysis of his overall job responsibilities. Importantly, a conflict exists in the record as to just how often Mr. Shea serves as a team lead and how much of his time is devoted to team lead duties when he is acting in that role. As noted previously, Mr. Freeman testified that Mr. Shea serves as team lead approximately fifty percent of the time, Freeman Dep., Def.'s Mot. Excerpts, at 32-33, while Mr. Shea estimated that he serves as team lead in approximately twenty to thirty-five percent of cases. *See* Shea Dep. at 75-76. Likewise, there is conflicting evidence as to how much of Mr. Shea's time on missions on which he serves as team lead is spent on duties particular to the team lead position. *Compare* Shea Dep. at 167 (estimating that team lead duties comprise ten percent of Mr. Shea's time on such missions), *with* Freeman Dep. at 71 (estimating that the team lead duties take up as much as forty percent of a team lead's time).

The court finds the conflicting testimony over the proportion of Mr. Shea's time spent serving as team lead and performing team lead duties to be a genuine dispute of material fact that bars entry of summary judgment for either party. The disparity in the record prevents the court from determining Mr. Shea's primary duty and also affects the analysis of the other prongs of the administrative exemption test as discussed *infra*. The other elements are important. As the government argues, "while '[t]eam [l]eader status, *by itself*, does not invoke the administrative exemption,' *Grandits v. United States*, 66 Fed. Cl. 519, 540 (2005), team lead status as part of a

---

regulations for federal employees, where justified." *Id.* at 306. OPM's regulations at issue in *Adams* ultimately were applied to border patrol officials who had brought claims under the FLSA, notwithstanding a variance from DOL's regulation. *See Billings*, 322 F.3d at 1344 ("[T]he variance in OPM's regulation is no more than needed to accommodate the difference between private and public sector employment. We see no error in the determination by the Court of Federal Claims that the OPM regulation is reasonable application of the Fair Labor Standards Act as to the federal sector.").

job that involves determining how to carry out surveillance does."  Def.'s Reply at 9 (emphasis in original).[8]

### B.  Whether the Primary Duty Involves the Exercise of Discretion on Matters of Significance

The element of the FLSA administrative exemption test relating to discretion as to matters of significance is strongly affected by the conflicting evidence as to Mr. Shea's time spent on team lead duties.  The government submits that Mr. Shea satisfies this element because "the position description for Investigations Specialists and the evidence of plaintiff's day-to-day activities make clear that plaintiff exercises significant discretion and independent judgment[; Mr. Shea] '[p]lans, schedules and coordinates the logistical and operation[al] aspects of physical surveillance.'"  Def.'s Mot. at 9.  The government emphasizes that "[p]rior to going on a mission, Mr. Shea decides what electronic surveillance devices to bring" and the deployment and means of surveillance.  *Id.* (citing Shea Dep.).  The government also points to the evidence that Mr. Shea's team will decide the proper beginning and ending time for their surveillance based on what they determine the subject's "pattern of life" to be.  *Id.* at 10.

As to Mr. Shea's duties when serving as team lead, the government emphasizes the fact that "the team lead is 'responsible [for] mak[ing] sure that the members of the team are ready, that they know where they have to be and when they have to be there, that they understand the concept of the operations, [and] that they understand how we will execute the mission," Def.'s Mot. at 10 (quoting Freeman Dep., Def.'s Mot. Excerpts, at 35-36), and the fact that, when serving as team lead, Mr. Shea contacts Mr. Freeman to keep him informed as a courtesy, not because he is required to, *id.* at 10.

Mr. Shea in turn argues that his work does not satisfy the discretion prong because "[w]hile [Mr.] Shea makes choices in surveilling targets, those choices involve applying 'well-established techniques' to the circumstances."  Pl.'s Cross-Mot. at 19 (citing 5 C.F.R. § 551.206(e) ("The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources.")).  As well, he contends that certain aspects of his surveillance operations involve no discretion, but rather have a formulaic stimuli-response aspect, *e.g.*, when deciding whether to conduct surveillance by foot or by vehicle, Mr. Shea "merely uses whatever mode of transportation the target is using."  *Id.* at 19 (citing Shea Dep. at 26).

Mr. Shea admits that the government's argument that "'planning, scheduling, and coordinating' surveillance" bears some relationship to his job duties but notes that "[he] performs such work only when he serves as team lead or assistant team lead."  Pl.'s Cross-Mot.

---

[8]*Grandits* concerned claims by Customs Service Import Specialists to overtime wages under the FLSA and focused on applicability of the administrative exemption.  *See Grandits*, 66 Fed. Cl. at 520-27.

at 20-21 (citing Freeman Dep. at 93-94).[9]   Nonetheless, Mr. Shea asserts that the team lead "is 'just basically a coordinator['] who does not 'instruct[] people on what to do'," *id.* at 21 (quoting Shea Dep. at 39, 166), and that "even if [Mr.] Shea did supervise his colleagues as a team lead, such supervision would not make him an administrative worker," *id.* (citing *Mullins v. City of New York,* 653 F.3d 104, 115 (2d Cir. 2011) (ruling on the duties of police sergeants who instructed and directed police officers)).[10]   Mr. Shea notes that even if his work as team lead is

---

[9]The materials in the record do not differentiate between the duties of a team lead and an assistant team lead.

[10]*Mullins* addressed the applicability of the executive exemption to police sergeants whose positions were governed by DOL's regulations for "first responders."   *See Mullins*, 653 F.3d at 107 (citing 29 C.F.R. § 541.3)   That regulation provides in pertinent part that:

> (b)(1) The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

> (2) Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100.   Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighter a fire.

> (3) Such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200.

> (4) Such employees do not qualify as exempt professionals because their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction or the performance of work requiring

considered within the scope of his primary duty and those responsibilities are characterized as supervisory or relating to the coordination of surveillance, "[p]lanning work may be exempt when it relates to the management or general business operations of the employer[,] . . . but it is not exempt when it involves the employer's production function." *Id.* at 22 (citing *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1223-24, 1231 (5th Cir. 1990) (addressing television producers who planned segments of news programs)).

The government contends that Mr. Shea's argument regarding whether "he is simply applying 'well-established techniques' or reacting to the target's behavior miss[es] the point." Def.'s Reply at 9 (citing Pl.'s Cross-Mot. at 19-20). This is so, the government submits, because no evidence exists that Mr. Freeman reviews the decisions Mr. Shea makes, and there is no direct oversight over whether Mr. Shea stays "within the appropriate parameters." *Id.* Indeed, "[t]hat he is well[-]trained and experienced enough to think on his feet when the target changes his or her behavior does not reduce the discretionary nature of his duties." *Id.*

Mr. Shea denies that he exercises any discretion as to "matters of significance" because that term, as used in the OPM regulations concerns those matters that "have a broad effect on the employer's operations, . . . such as formulating, affecting, interpreting, or implementing management policies or operation procedures[;] making decisions with significant financial impact[;] and binding the organization on significant matters." Pl.'s Cross-Mot. at 20 (citing 5 C.F.R. § 551.206(b)(1)) (internal quotations and brackets omitted). He argues that, while his "work is significant in the sense that it helps prevent classified information from falling into the wrong hands," the administrative exemption test focuses "on the significance of an employee's discretion to the employer's operations, not to society at large." *Id.* (citing Def.'s Mot. at 10).

The government disputes Mr. Shea's argument that the "matters of significance" component is not satisfied here because his work "is only significant to 'society at large'[, which argument] attempts to narrow the inquiry to what is significant in the context of a private entity." Def.'s Reply at 10. The government contends that "[a] matter can be significant to a

---

invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as required under § 541.200. Although some police officers, fire fighters, paramedics, emergency medical technicians and similar employees have college degrees, a specialized academic degree is not a standard prerequisite for employment in such occupations.

29 C.F.R. § 541.3(b).

Another case discussed in briefing and at oral argument, *Morrison v. County of Fairfax*, 826 F.3d 758 (4th Cir. 2016), also applied the first-responder regulation, this time in the context of the executive and administrative exemptions. *Id.* OPM's regulations, though mentioning some job duty considerations that could bear on Mr. Shea's exemption status, *see* 5 C.F.R. § 551.206(b)-(i), (n), contain no provision analogous to DOL's first-responder regulation. Sections 551.215-.216 of OPM's regulations concern law enforcement and fire protection activities, but do so in the context of a provision related to the hourly thresholds for overtime pay for law enforcement and fire protection personnel. *See* 29 U.S.C § 207(k).

[g]overnment agency because it is significant to society at large[ and] preventing classified information from falling into the wrong hands is significant to the U.S. Navy's operations." *Id.* "Mr. Shea testified that 85% of his missions involve counterintelligence and that '90[% of his missions] are critical;'" and that "allowing classified information to go to the wrong parties could be 'catastrophic.'" Def.'s Mot. at 10 (citing Shea Dep.).

The pertinent OPM regulation provides that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered[, and t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." 5 C.F.R. § 551.206(a). The regulation gives a non-exhaustive list of ten factors that may be relevant to whether an employee satisfies this prong. *See id.* at § 551.206(b)(1)-(10). Of those factors, some do not apply to Mr. Shea based on the undisputed facts in the record. *See id.* at § 551.206(b)(1), (4), (6)-(7), (9)-(10). For example, Mr. Shea does not formulate agency policy, does not negotiate with authority on NCIS's behalf, and does not resolve grievances on NCIS's behalf. Other factors may arguably be applicable to Mr. Shea. *See id.* at § 551.206(b)(2)-(3), (5), (8). Mr. Shea's primary job duties may be framed as involving "major assignment[s] in conducting the operations of the organization," and the manner with which Mr. Shea and his team respond to changes in the surveillance subject's actions may be argued as constituting "authority to waive or deviate from established policies and procedures without prior approval." *See id.* at § 551.206(b)(2), (5).

In short, the conflicting evidence as to Mr. Shea's team lead duties—and how the blend between conducting surveillance and serving as team lead is eventually ascertained—render a resolution of this issue on summary judgment improper. *See, e.g., Benevides v. City of Austin*, No. A-11-CV-438-LY, 2013 WL 3197636, at *10 (W.D. Tax. June 20, 2013) (citing *Mullins*, but concluding that its holding did not apply to a law enforcement official called a Field Commander because they "do significant management and administrative work separate and apart from" the supervisory work by police sergeants found non-exempt in *Mullins*).

### C. *Whether Mr. Shea's Primary Duty Relates to NCIS's Management or Business Operations*

The government contends that Mr. Shea's primary duty is directly related to NCIS's management or business operations, rather than its production operations, because he is within the category described in the OPM regulations as "employees who develop, interpret, and oversee agency or Governmentwide policy[, which employees] perform[] management support functions." Def.'s Mot. at 11 (citing 5 C.F.R. § 551.206(h)). The government asserts that "the duties . . . that are potentially in dispute . . . relat[e] more to terminology than substance," and the duties on which both Mr. Shea and the job description are in agreement are "sufficient to show the management support function [he] perform[s]." *Id.* at 11, 13. For example, "[p]lanning, scheduling, and coordinating physical surveillance relates to and supports the general business operations of NCIS. Specifically, when Investigations Specialists determine how to do the surveillance and carry it out . . . they are responsible for interpreting and overseeing agency policy and procedures." *Id.* at 11. And, "[r]eporting changes in surveillance methodologies and indicators of espionage or enemy spying to the chain of command supports management and

directly affects the agency's counterintelligence priorities, policies, and procedures." *Id.* at 12. Under this framing, the management function served by the duties the government cites is "NCIS['s effort] to employ the very latest surveillance methodologies and identify new counterintelligence threats as they emerge." *Id.* Indeed, the government argues that "[c]ombined with the fact that Mr. Shea is also involved in post-mission briefings to discuss 'ideas for making the mission better' and gives ideas for adjustments in surveillance policy and procedures by monitoring changes in surveillance methodologies, . . . Mr. Shea's duties . . . affect and influence the formulation of surveillance policies and operating procedures." Def.'s Reply at 6.

The government attempts to distinguish Mr. Shea's job duties from those in cases where the plaintiff was found to be non-exempt. *See* Def.'s Reply at 6-7 (citing *Reich v. State of N.Y.*, 3 F.3d 581 (2d Cir. 1993), *overruled by implication on other grounds by Seminole Tribe v. United States*, 517 U.S. 44 (1996), *as recognized in Mullins*, 653 F.3d at 116-17 (Unlike Mr. Shea, "the primary duty of the law enforcement officers [in *Reich*] . . . involved 'preventing, investigating, and detecting violations of criminal laws' . . . and thus they 'do not administer the affairs of that bureau."); *Dalheim*, 918 F.2d at 1231 (television producers' "'responsibilities begin and end with the ten-to-twelve minute portion of the newscast they are working on' . . . [but] Mr. Shea's responsibilities affect policy and procedures, and thus future missions, in both the short and long term."); *Adam v. United States*, 26 Cl. Ct. 782, 787 (1992) (Unlike Mr. Shea, Border Patrol agents were non-exempt "because Border Patrol [a]gents' duties involve compliance with *national* immigration policy, and 'do not involve obtaining compliance with INS policies,' [and thus] their duties do not affect INS management policies.")). The government additionally submits that Mr. Shea's job duties "significantly affect[ ] the management of the agency [and] . . . support[ ] the general 'business' of surveillance." Def.'s Mot. at 14. The government also cites the fact that "[i]n a decision regarding a similar position, OPM concluded that supplying information that 'significantly affects the execution of the mission of the' agency meets the primary duty test under the administrative exemption." *Id.* at 14 (citing OPM Decision, Defense Security Service Investigator, GS-1810-12 (appended to Def.'s Mot. as Ex. 2)).[11]

Mr. Shea argues that his primary duty is not a management support function, as the government asserts, because "the record contains no evidence that [Mr.] Shea's day-to-day activities relate to agency policy[, and that neither Mr.] Shea nor his supervisor testified that [he] 'oversees' surveillance policy, 'develops' surveillance policy, 'interprets' surveillance policy, or does anything else related to agency policy." Pl.'s Cross-Mot. at 15. Moreover, Mr. Shea posits, even if the record contained evidence indicating that he performed those duties, the government has not shown that those duties constitute his primary duty. *See id.* at 16. He emphasizes the dichotomy contained in OPM's regulations "between 'production' work and 'management or

---

[11]OPM's claim decisions are relevant to the court's inquiry but not dispositive. *See* OPM, *Pay & Leave Claim Decision, available at* https://www.opm.gov/policy-data-oversight/pay-leave/claim-decisions/fair-labor-standards-act/#url=About-Claim-Decisions (last visited Jan. 29, 2018) ("The FLSA claim decisions . . . do not substitute for application of [OPM's] FLSA regulations and are not 'case law.' These decisions should not be used as the basis for other FLSA claims because these decisions do not provide enough information for direct application in other FLSA claims.")).

general business operations.'" *Id.* at 13 (referencing 5 C.F.R. 551.206).  Production work encompasses "duties relat[ing] to whatever 'goods and services . . . constitute the [employer's] offerings.'" *Id.* at 13 (citing *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1127 (9th Cir. 2002) (alterations in original); *see also Reich*, 3 F.3d at 587 ("[F]or example, employees are non-exempt who 'conduct—or "produce"— . . . criminal investigations.'")).  NCIS's products, submits Mr. Shea, are "criminal and counterintelligence investigations and operations," and Mr. Shea's primary duty of conducting surveillance "directly contributes to this production function." *See* Pl.'s Reply at 8.

Mr. Shea also disputes the government's characterization of his duties as they relate to the operations or management of NCIS.  First, Mr. Shea notes that the only citation to facts that the government offers for its assertion that he affects, influences, interprets or implements policies or that he develops, promotes, or supervises others is to the "testimony that [Mr.] Shea participates in post-mission briefings in which his supervisor and his team discuss 'ideas that could make the mission better.'"  Pl.'s Reply at 8-9.  Mr. Shea contests even this reference, arguing that "the [g]overnment offers no evidence that [Mr.] Shea's comments in these sessions have ever affected NCIS's policy, or that [Mr.] Shea's participation in the meetings is one of his main duties."  *Id.* at 9.  In other words, Mr. Shea argues, simply participating in a meeting where feedback or ideas are discussed does not support the government's argument that his primary duty affects agency policy and thus constitutes a management support function.  *Id.*

In short, Mr. Shea argues that he "is non-exempt because his work directly furthers NCIS's core mission, rather than constituting an internal support service that contributes to running the agency itself, Pl.'s Cross-Mot. at 17 (internal quotations and brackets omitted), and thus his primary duty is not work "directly related to the management or general business operations . . . of the employer, *id.* (quoting 5 C.F.R. § 551.206).

In the circumstances at hand, the court concludes that the duties Mr. Shea performs when he is acting as a line Investigations Specialist—*i.e.*, not serving as team lead—do not influence NCIS's management or business operations because the government has failed to point to evidence indicating that the review given at end of mission debriefings influences NCIS management or policy.  But, because of the uncertainties surrounding Mr. Shea's job duties when serving as team lead and their relation to NCIS's management or general business functions, the court cannot conclude that this issue as a whole is ripe for resolution at the summary judgment stage.

### D.   Whether the Primary Duty Involves Non-Manual Work

The government next argues that Mr. Shea's job duties are "primarily non-manual work that [are] intellectual and varied in nature and of a specialized or technical nature that require[] considerable special training, experience, and knowledge."  Def.'s Mot. at 13.  The government emphasizes Mr. Shea's testimony that the only manual work he believed he performed was maintenance on surveillance equipment.  *See id.*; Shea Dep. at 42.  Likewise important to the government's argument is that a portion of Mr. Shea's time—around 50% for the most recent fiscal year, and around 20% for previous fiscal years—is spent in the office and not on surveillance missions, and this time is spent, *inter alia*, on administrative tasks and making travel

arrangements and otherwise preparing for field work.  *See* Def.'s Reply at 10-11; Shea Dep. at 36, 42.[12]  And finally, even when Mr. Shea is in the field, the government asserts that "many of Mr. Shea's activities are not 'manual' in nature, such as communicat[ing] with the team, following targets, navigating, operating camera equipment, and reporting back to his supervisor once a day."  Def.'s Reply at 11.

Mr. Shea counters that "[i]t is undisputed that [he] has spent most of his work time in the field . . . [a]nd as in *Adam*, [26 Cl. Ct. at 793, Mr.] Shea's surveillance duties 'are not of the type ordinarily associated with a desk-bound employee'."  Pl.'s Cross-Mot. at 20.  Mr. Shea characterizes the government's argument for why his job duties fall within the category of office or non-manual work as resting entirely on the allocation of time between surveillance missions and time spent in the office, on the one hand, and Mr. Shea's statement at his deposition "that he did not perform much 'manual labor'" on the other.  Pl.'s Reply at 13.  As to his deposition statement, Mr. Shea argues that his "layman['s] understanding of the term 'manual labor' does not necessarily correspond to the legal definition under the administrative exemption."  *Id.*  In assessing the legal definition, Mr. Shea cites to *Adam*, in which the court resorted to the dictionary definition of "manual" as meaning "requiring or using physical skill and energy."  *See Adam*, 29 Cl. Ct. at 792.  In short, Mr. Shea argues, because his primary duty is conducting surveillance, which duty—including as it does, "following individuals by foot and vehicle," *see* Pl.'s Reply at 13—is manual work and thus Mr. Shea does not satisfy this prong of the administrative exemption either, *id*.

OPM's regulation do not clarify the nature of non-manual work that falls outside the administrative exemption, but DOL's regulations provide informative context.  *See, e.g., Berg v. United States*, 49 Fed. Cl. 459, 474 (2001) (citing *Adam*, 26 Cl. Ct. at 793) (noting that the then-current DOL regulations defined the exemption as essentially applying to "white-collar" employees and quoting the DOL regulation for the proposition that "if the employee performs so much manual work . . . that he cannot be said to be basically a 'white-collar' employee he does not qualify for exemption as a[n ] . . . administrative employee . . . [and thus,] it is obvious that employees who spend most of their time . . . using tools, instruments, machinery, or other equipment, or in performing repetitive operations with their hands, no matter how much skill is required, would not be . . . administrative employees") (quoting 29 C.F.R. § 541.203 (1991)).

The persuasive weight of these earlier opinions is tempered somewhat by the fact that recent amendments to both the OPM's and DOL's regulations have removed detailed language in favor of a shorter statement of the manual-labor test.  *See* 5 C.F.R. § 551.206; 29 C.F.R. § 541.200.[13]  The most recent cases from this court addressing the non-manual work

---

[12]At his deposition, Mr. Shea testified that a portion of his time spent in the office—*i.e.,* not on a surveillance mission—is spent on what he termed "area familiarization" and on testing the equipment his team uses on missions.  Shea Dep. at 125-28.

[13]The 2004 amendment to DOL's regulation notes that "[t]he proposed rule . . . streamlined, reorganized, and updated the regulations in other ways[ including] . . . utiliz[ing] objective, plain language . . . [which] was intended to consolidate and streamline the regulatory text, reduce unnecessary duplication and redundancies, [and] make the regulations easier to

requirement were decided before the most recent amendments to OPM's regulations, and thus frame the non-manual work analysis in terms of white-collar language that has since been removed from the regulation.  *See, e.g., Adams*, 65 Fed. Cl. at 199-200 (citing the 2005 version of the OPM regulation); *Adam*, 26 Cl. Ct. at 793 (citing the 1991 version of the OPM regulation).[14]

As the court noted in *Adam*, the plain-language meaning of the word "manual" is informative when considering the parties' arguments here.  *See* 26 Fed. Cl. at 792-93.[15]  While the manual or non-manual status of an employee's primary duty may be relatively apparent in a case such as *Berg*, where the plaintiffs "spend the majority of their actual worktime maintaining and repairing equipment with testing equipment, tools and cleaning supplies, working off floors and work benches, and following instruction manuals," 49 Fed. Cl. at 474, in this case the determination is less evident.  The dispute over Mr. Shea's time and activities as team lead and also his work in conducting surveillance while not serving as team lead, precludes resolution of this prong at the summary judgment stage.

### E.  Synopsis

The conflicting evidence as to the extent and prevalence of the team lead role in Mr. Shea's day-to-day duties bars summary judgment.  Accordingly, the government's motion for summary judgment as to whether Mr. Shea is properly classified as FLSA-exempt is denied, and Mr. Shea's motion for summary judgment that he was erroneously classified as FLSA-exempt is likewise denied.

---

understand and decipher when applying them to particular factual situations."  Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 26-28 (Apr. 23, 2004) (codified in relevant part at 29 C.F.R. § 541.200).  DOL's amendment commented that this streamlining eliminated what it termed "long" tests in favor of a "short dut[y] test structure" and that revisions were made to clarify that "manual laborers and other blue collar workers cannot qualify for exemption."  *Id.* (internal quotation marks omitted).  While this regulatory history is far from a model of clarity, the 2007 amendment to OPM's regulation noted that "[c]hanges were made to [the administrative exemption] section largely to harmonize with [DOL's] changes in the description of administrative work."  Pay Administration Under the Fair Labor Standards Act, 72 Fed. Reg. 52,753, 58 (Sept. 17, 2007) (codified in relevant part at 5 C.F.R. § 551.206).

[14]One example, from a court in the Southern District of Texas ruling on the parties' motions for summary judgment under DOL's regulations, cites examples of manual labor as including "busting concrete, framing, hanging sheetrock, installing insulation, and pouring concrete" as well as "cleaning, setting up, and 'fixturing.'"  *Villegas v. Dependable Const. Servs., Inc.*, No. 4:07 cv 2165, 2008 WL 5137321, at **2, 13 (S.D. Tex. Dec. 8, 2008).

[15]Black's Law Dictionary defines "manual" as an adjective describing something that is "[u]sed or performed by hand," and defines "manual labor" as "[w]ork performed chiefly through muscular exertion, with or without tools or machinery."  *Manual, Manual Labor*, Black's Law Dictionary, at 1108, 1109 (10th ed. 2014).  *Adam* cites to Webster's Ninth New Collegiate Dictionary for the proposition that "[a] dictionary definition of 'manual' is, 'requiring or using physical skill and energy.'"  *Adam*, 26 Cl. Ct. at 792-93.

## II.  THE ISSUE OF WILLFULNESS

Whether NCIS's conduct was willful is relevant to Mr. Shea's case because "[a]ny action . . . to enforce any cause of action for . . . unpaid overtime compensation . . . shall be forever barred unless commenced within two years . . . except that a cause of action arising out a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).

Mr. Shea asserts that the government willfully misclassified his position as FLSA-exempt primarily because "[t]he testimony [of Ms. Cruz] shows that the Agency is acting with disregard to its obligations under the FLSA."  Pl.'s Cross-Mot. at 26.  Ms. Cruz testified that Mr. Shea's position description was in an outdated format that would not be used in classifying a position today but has continued to support NCIS's exemption classification.  *See supra*, at 7 (citing Cruz Dep., Pl.'s Cross-Mot. Excerpts, at 27-28).  Ms. Cruz defended the classification of Mr. Shea's position as FLSA-exempt while agreeing that his role contributed to NCIS's production function.  *See* Pl.'s Cross-Mot. at 27 (NCIS "demonstrated a lack of knowledge amounting to disregard for its obligations under the FLSA . . . [because Ms. Cruz] acknowledged that [Mr.] Shea's work [contributed to NCIS's production function, but nevertheless] . . . testified that these facts support a finding that [he] is an administrative employee.").  Mr. Shea also points to a report NCIS submitted to OPM in the course of another FLSA dispute, OPM Decision F-1811-11-02, *see* Pl.'s Cross-Mot. at 27-28, in which NCIS asserted that the claimant "was at all times during the applicable period, a line investigator, performing the basic production work of the Agency, namely, criminal and counterintelligence investigations and operations."  OPM Decision F-1811-11-07.

The government avers that Mr. Shea's position description continued in its outdated format because Mr. Shea and Mr. Freeman confirmed that the position description still accurately reflected the employee's duties at each annual performance review, so NCIS had no reason to revise or adapt the position description to the format NCIS currently uses to classify positions.  *See* Def.'s Reply at 11-12.  Because Mr. Shea's position description was in the proper format when last it was classified, and Mr. Shea and Mr. Freeman did not flag to the agency that it was out of date or that his job duties had changed, willfulness cannot be shown.  *Id.*[16]

The government also highlights the fact that Ms. Cruz testified about a compilation of "FLSA regulations and relevant guidance" used in classifying positions at NCIS, and that she "testified about the process: '[T]hey would go through each one of the [exemption] criteria and

---

[16]Mr. Shea has put forth no evidence that he raised concerns to Mr. Freeman or others at NCIS that he was wrongly classified as exempt.  Notice is relevant.  *See, e.g., Galeana v. Lemongrass on Broadway Corp.,* 120 F. Supp. 3d 306, 315 (S.D.N.Y. 2014) (finding a violation willful where, *inter alia*, "plaintiffs allege that they repeatedly notified the individual defendant that they were not receiving . . . overtime pay, and never received any response to such complaints"); *see also Pollis v. New Sch. Soc. Research*, 132 F.3d 115, 119-20 (2d Cir. 1997) (holding that female college professor's complaints on multiple occasions about discrepancies in pay sufficed to support jury's finding of reckless or willful violation of Equal Pay Act).

review it against the position description to see if it was met, and go step by step and analyze each one.'" Def.'s Reply at 13 (*citing* Cruz Dep., Def.'s Reply Ex. 7, at 51). In sum, the government points to the facts in the record showing that NCIS's classifiers follow a process that involves referencing the governing regulations and other interpretive guidance and analyzing the exemption as it applies to each employee's position description, and submits that this evidence establishes that the government did not act willfully in making any misclassification that might later be shown. *See id.* at 11-14.

The proper framing of the term "willful" historically was the subject of some controversy. *See Marrs v. United States*, No. 16-1297, ___Fed. Cl. ___, ___, 2017 WL 4855798, at *2 (Oct. 27, 2017) (tracing the development of the "willfulness" standard from *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971), to *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Nonetheless, since *Richland Shoe*, it has been well-established that "willfulness" is a high bar to clear. *See Richland Shoe*, 486 U.S. at 135 & n.13 ("If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful under either petitioner's [more lenient] test or under the standard [the Court adopts]. If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be [ ] considered [willful] under . . . the . . . standard we approve today."). Thus, "[p]roof of willfulness requires the plaintiffs to show that [the employer] 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Bull v. United States*, 479 F.3d 1365, 1379 (Fed. Cir. 2007) (*citing Richland Shoe,* 486 U.S. at 133). Correlatively, OPM's regulations state that, "[r]eckless disregard of the requirements of the Act means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. As the parties correctly note, "the employee bears the burden of proving the willfulness of the employer's FLSA violations." *Adams*, 350 F.3d at 1229 (*citing Bankston v. Illinois,* 60 F.3d 1249, 1253 (7th Cir. 1995)).

On the undisputed facts in the record, the court concludes that Mr. Shea has failed to carry his burden of proof to show that the government knew or showed reckless disregard for whether he was erroneously classified as FLSA-exempt, and thus the government is entitled to summary judgment on this issue.

### III.   WHETHER THE GOVERNMENT'S CLASSIFICATION OF MR. SHEA AS FLSA-EXEMPT HAD REASONABLE BASIS AND WAS DONE IN GOOD FAITH

Unlike willfulness, the burden to show reasonable basis and good faith rests with the government. *See Bankston*, 60 F.3d at 1254 ("[T]he . . . court may choose not to award liquidated damages where the employer shows that it acted in good faith with reasonable grounds.") (internal citations omitted); *Bull*, 479 F.3d at 1379 ("The burden rests on the government to establish its good faith and the reasonable grounds for its decision."). This is a more lenient standard than willfulness. *See, e.g.*, *Kinney v. District of Columbia,* 994 F.2d 6, 12 (D.C. Cir. 1993) ("Good faith requires only a showing that the employer subjectively acted with an honest intention to ascertain what the Act requires and to act in accordance with it.") (internal quotations and ellipses omitted).

Mr. Shea argues that the government has failed to make this lesser showing because "the [g]overnment has presented no evidence of why or how it decided to apply the administrative exemption to the Investigations Specialist position . . . [, and] the Agency does not even know if [it] relied on an exemption other than the administrative exemption to classify [Mr.] Shea as exempt." Pl.'s Cross-Mot. at 25.  Mr. Shea also argues that the continued classification of his position as exempt is further evidence of the lack of good faith and reasonable basis supporting NCIS's classification decision.  *Id.*

The government, in turn, submits that its classification of Mr. Shea's position was founded on a reasonable basis and in good faith, noting that Mr. Shea did not raise concerns about the accuracy or inaccuracy of his position description and that the classification process employed by NCIS was a good faith means of determining Mr. Shea's classification.  *See* Def.'s Mot. at 16-17.

The court concludes that genuine issues of material fact preclude resolution of this issue at this stage of the case.  The lack of information regarding the initial classification decision in 2007 places an emphasis on the parties' subsequent conduct.  And the testimony regarding the timing of changes in pay administration for members of Mr. Shea's team, *see* Shea Dep. at 155, and the classification of other employees whose job duties may bear similarities to Mr. Shea's, *see id.* at 158-61, when considered alongside the testimony of Ms. Cruz as to the procedure NCIS is claimed to follow when classifying positions under the FLSA, *see* Cruz Dep. at 51, lead the court to conclude that issues of fact preclude the entry of summary judgment for either party on this issue.[17]  Just as resolving the factual disputes relating to Mr. Shea's job duties will enable this court to rule on whether Mr. Shea was misclassified as FLSA-exempt, so too will it aid in the determination of whether the government acted in good faith and with reasonable basis.

## CONCLUSION

For the reasons stated, the court determines that genuine disputes of material fact exist as to whether Mr. Shea was erroneously classified as FLSA-exempt and whether the government acted in good faith and with reasonable basis.  The parties' motions for summary judgment on these issues accordingly are DENIED.  Contrastingly, there is no genuine dispute of material fact as to whether the government acted willfully, and the court concludes that the government is entitled to judgment as a matter of law on this issue.  Therefore, the government's motion for summary judgment as to willfulness is GRANTED.

The court requests that the parties file a joint status report by February 16, 2018, providing a plan and schedule for continued proceedings in this case.

---

[17]At the hearing on the cross-motions, the government advised that Investigation Specialists who are coded as GS-7 or GS-9 have been determined to be non-exempt, Hr'g Tr. 38:7-19.  The timing of this classification was not disclosed.  *Id.*

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge