# In the United States Court of Federal Claims

No. 16-793C

(Filed:  May 31, 2019)

| | |
|---|---|
| **************************************** ) | |
| **JOHN A. SHEA,** ) | Post-trial decision on claim by federal |
| ) | employee for unpaid overtime and |
| **Plaintiff,** ) | premium pay pursuant to the Fair Labor |
| ) | Standards Act, 29 U.S.C. § 216(b); |
| **v.** ) | primary duty test for exempt employees; 5 |
| ) | C.F.R. § 551.202(e); alternate test based on |
| **UNITED STATES,** ) | combination of functions; 5 C.F.R. § |
| ) | 551.202(h); measure of back pay; |
| **Defendant.** ) | liquidated damages |
| ) | |
| **************************************** ) | |

Linda Lipsett, Bernstein & Lipsett, P.C., Washington, D.C., for plaintiff.  With her on the briefs and at trial were Daniel M. Rosenthal and Nari E. Ely, James & Hoffman, P.C., Washington, D.C.

David M. Kerr, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him at trial was Mariana Acevedo, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division and Robert E. Kirschman, Jr., Director, and Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Henry Karp, Senior Trial Attorney, Naval Litigation Office, and S. Christopher Mullins, Jr., Assistant Counsel, Civilian Personnel Law, Naval Criminal Investigative Service, Quantico, Virginia.

## OPINION AND ORDER

LETTOW, Senior Judge.

This post-trial decision addresses a claim by plaintiff John A. Shea for damages attributable to alleged violations of the Fair Labor Standards Act of 1938 ("Fair Labor Standards Act" or "FLSA"), as amended, 29 U.S.C. §§ 201-19, particularly 29 U.S.C. § 216(b), and premium and back pay provisions applicable to federal government employees, 5 U.S.C. §§ 5541-50b, 5596.  Compl. ¶¶ 1, 2, 9.  Mr. Shea alleges that the United States, acting through the Naval Criminal Investigative Service ("NCIS"), erroneously classified him as exempt from the FLSA, and thus "wrongfully and willfully denied" Mr. Shea overtime compensation for hours worked in excess of forty hours each week and premium pay for scheduled overtime and hours worked at night.  Compl. ¶¶ 14, 16; *see also Shea v. United States*, 136 Fed. Cl. 95 (2018)

(resolving and largely denying competing cross-motions for summary judgment).  Mr. Shea seeks a declaration that NCIS should not have designated him as exempt from the Fair Labor Standards Act, compensatory damages of up to $73,139.41 in back pay from July 2014 through September 2018, unspecified back-pay at a similar rate from October 2018 until NCIS classifies Mr. Shea as non-exempt, liquidated damages equal to compensatory damages, and attorneys' fees and costs.  [Pl.'s] Post-Trial Br. ("Pl.'s Br.") at 22-34, ECF No. 55; *see also* Compl. at 5.

A two-day trial commencing on December 17, 2018 was held in Washington, D.C. to resolve the factual disputes regarding Mr. Shea's primary duty and the basis for NCIS's classification decision.  Following post-trial briefing, the court heard closing arguments on March 20, 2019, and the case is now ready for disposition.

The court finds that NCIS erred by classifying Mr. Shea as exempt from the FLSA. NCIS's erroneous classification decision nevertheless evidenced a reasonable basis and occured in good faith, precluding liquidated damages.  The measure of compensatory damages should reflect the Office of Personnel Management's ("OPM's") procedure for calculating overtime pay for an employee receiving premium pay.  Accordingly, Mr. Shea is awarded $42,750.84 in back pay for the period of July 2014 through September 2018, and an amount to be calculated using the same methodology for subsequent overtime hours until such a time as NCIS has started to pay Mr. Shea overtime that reflects his non-exempt status.

## FACTS[1]

### A.  *The Naval Criminal Investigative Service's Special Surveillance Team*

NCIS, popularized by a long-running television drama of the same name, is a federal law enforcement agency existing within the Department of the Navy.  Joint Ex. ("JX") 1 at 1 (position description for Mr. Shea); *see also About NCIS*, https://www.ncis.navy.mil/Pages/AboutNCIS.aspx (last visited May 28, 2019).  NCIS "investigate[s] felony federal crimes, prevent[s] terrorism[,] and protect[s] secrets for the Navy and Marine Corps," and "defeat[s] threats from across the foreign intelligence, terrorist[,] and criminal spectrum."  *About NCIS*; *see also* JX 1 at 1; Joint Stipulations of Fact ("Joint Stip.") ¶ 1, ECF No. 46.  Reporting to the Navy, the organization is managed and staffed by civilian government employees.  *See About NCIS*.

Mr. Shea has worked as a GS-12 Investigations Specialist for NCIS's Special Surveillance Team ("Surveillance Team") since 2010 and has worked overtime hours since July 2014.  JX 1 at 1, 2; Joint Stip. ¶¶ 2-4.[2]  NCIS has classified the GS-12 Investigations Specialist position, and thus Mr. Shea, as exempt from the overtime provisions of the Fair Labor Standards

---

[1]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC").  Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[2]All references to an Investigations Specialist refer specifically to those assigned to the Surveillance Team unless otherwise noted.

Act since 2007.  Joint Stip. ¶ 6.  *See also* JX 1 at 1.  Since at least July 2014, Mr. Shea has received Administratively Uncontrollable Overtime ("AUO") pay, equal to 25% of his base salary, in lieu of overtime pay at the rate of one-and-one-half base pay under the Fair Labor Standards Act.  Joint Stip. ¶ 5.  Mr. Shea maintains that NCIS erred when it classified him as exempt.  Pl.'s Br. at 1.  The government argues that Mr. Shea meets the criteria for the administrative exemption to the overtime provisions of the FLSA.  Def.'s Resp. to Pl.'s Post-Trial Br. ("Def.'s Br."), at 5, ECF No. 57.

The Surveillance Team exists within NCIS's Office of Special Projects.  Pl.'s Ex. ("PX") 1; Tr. 296:3-4 (Test. of Dennis T. Freeman).  The Surveillance Team supports criminal and counterintelligence investigations by conducting surveillance operations worldwide.  Tr. 47:12-22 (Test. of Mr. Shea).  As of October 2018, the Surveillance Team consisted of 13 employees to include a Surveillance Team supervisor ("Supervisor"), 10 surveillance specialists, and two pilots.  PX 1; Tr. 305:4-17 (Freeman).  From February 2015 to June 2018, which encompasses much of the relevant period for this litigation, Mr. Dennis Freeman served as the Supervisor.  Tr. 296:5-7 (Freeman).  Ms. Nanette Sevigny, another Surveillance Team member, served as the Acting Supervisor from June 2018 until October 2018.  Tr. 459:8-15 (Test. of Nanette Sevigny).  Mr. Cooper became the Supervisor in October 2018.  Tr. at 50:5-7; 333:4-10; PX 1.

Between January 2015 and June 2018, the Surveillance Team conducted 59 surveillance operations for more than three dozen different missions.  PX 25.[3]  Between October 2013 and September 2014, Mr. Freeman estimated that 22 operations occurred.  Tr. 336:12-14.[4]  Although the Special Surveillance Team is based in Washington, D.C., Tr. 490:1-6 (Sevigny), most operations occur outside of the D.C. area and require extended travel, Tr. 48:4-11 (Shea) (estimating 80% require travel); PX 25 (indicating that of 59 operations between February 2015 and June 2018, 15 occured locally, *i.e.*, in the National Capital Region).  Operations vary in length, though the typical operation lasts several weeks.  Tr. 48:4-11; *see also* PX 25 (showing 59 operations between January 22, 2015, and June 27, 2018, with durations ranging between 1 and 78 days).  Between 2014 and 2016, the Surveillance Team spent a majority of its time in the field conducting operations.  Tr. 170:8 to 171:4 (Shea) (estimating 80% in 2014, 2015, and 2016), 332:4-12 (Freeman) (estimating 70% in 2015 and 50%-60% in 2016).  In 2017, field time dropped to an estimated 40% to 50%.  Tr. 171:10-14 (Shea), 332:13-16 (Freeman).  Prior to June 2018, the Supervisor would often not accompany the Surveillance Team on operations.  *See* Tr. 50:2-23 (Shea) (estimating the times a supervisor accompanied the team between February 2015 and June 2018); 354:11-16 (Freeman) (stating he accompanied the team on 10 to 12 operations of 59 between February 2015 and June 2018).

---

[3]PX 25 lists 60 operations, but the team did not deploy for one listed operation.  PX 25 at 1.  The testimony and briefing refer to each surveillance operation or deployment as a "mission," while also using the term to refer to a specific case, for which there may be multiple surveillance operations.  *See, e.g.*, Tr. 338:1 to 339:4.  For example, the Surveillance Team deployed at least five separate times in support of "Mojave Red."  PX 25.  To avoid confusion, "mission" will refer to the overarching case while "operation" or "deployment" will refer to each discrete and time-delimited instance of surveillance support.

[4]The testimony and exhibits do not disclose how many operations occurred between October and December 2014.

### B.  *The Work of Investigations Specialists on the Special Surveillance Team*

The position of Investigations Specialist is structured with a career progression ladder that encompasses GS grades 7, 9, 11, and 12.  Tr. 278:16-19 (Test. of Stacy Cruz).  All Investigations Specialists on the Surveillance Team are currently GS-12s and operate under the same position description.  Tr. 35:17-19, 87:10-11 (Shea) (same grade); Tr. at 348:17 to 349:5 (Freeman) (same position description).  Surveillance Team Investigations Specialists are classified under occupational code 1801.  Joint Stip. ¶ 2; JX 1 at 1.

NCIS documented the duties of and requirements for a GS-12 Surveillance Team Investigations Specialist in a position description dating from 2009.  JX 1 at 2.  This position description does not distinguish responsibilities or performance levels based on GS grade.  *See* JX 1; Tr. 348:17-24 (Freeman).[5]

According to the 2009 position description, NCIS considers the GS-12 Investigations Specialist to be "Critical-Sensitive," JX 1 at 1, and requires an Investigations Specialist to be eligible for a Top-Secret security clearance and pass a polygraph examination, JX 1 at 2.  There is no formal educational prerequisite.  *See* JX 1 at 1.  An Investigations Specialist must possess knowledge of investigative techniques and procedures, investigative surveillance equipment such as cameras and radios, federal criminal statutes, executive branch policies relating to counterintelligence investigations, and the structure and functions of agencies within the intelligence community.  JX 1 at 2.  An Investigations Specialist must also communicate effectively orally and in writing.  JX 1 at 2.  Investigations Specialists do not carry firearms, JX 1 at 1, and are not considered law enforcement officers, *e.g.*, Tr. 109:12-19 (Shea).

Duties of a GS-12 Investigations Specialist per the 2009 position description focus on counterintelligence operations.  JX 1 at 1, 3.  For example, an Investigations Specialist "analy[zes] [] surveillance information involving contacts with hostile country citizens," "[i]dentifies indicators of possible espionage," and "[m]anages the collection, assessment, and reporting of information in support of investigative activity," to include "plan[ning], schedul[ing], and coordinat[ing] the logistical and operational aspects of physical surveillance." JX 1 at 1, 3.  An Investigations Specialist "[d]isseminates surveillance information" to supervisors and case agents, coordinates surveillance-related training, and "[p]repares and disseminates statistical, operational, and administrative reports to higher level personnel regarding intelligence information, resource allocation, utilization, productivity, accomplishments[,] and workload activities," and remains current with surveillance methods to recommend "adjustments in surveillance policy and procedures."  JX 1 at 3.

A salient duty is that on a "rotational basis, [a] senior level [Investigations Specialist] will serve as the team leader during physical surveillance operations in support of counterintelligence

---

[5]The 2009 position description expressly states it applies to an Investigations Specialist "assigned to the Special Surveillance Team (SST), within the [Office of Special Projects]."  JX 1 at 1.  Ms. Stacy Cruz, the chief of NCIS's Staffing, Classification, and Compensation division, in testimony mentioned possible differences between position description of Investigation Specialists occupying different offices or divisions.  Tr. 367:7-25 (Cruz).

investigations." JX 1 at 3. The position description describes the Team Leader as "responsible for directing all aspects of the surveillance operation to include directing team members in the analysis, evaluation, and interpretation of information collected; overseeing the preparation of reports; coordinating with [their supervisor]; and, providing expertise to team members in further development of a case." JX 1 at 3.

As testimony disclosed, NCIS is in the process of revising the position description for Surveillance Team Investigations Specialists. Tr. 282:1-4 (Cruz).

### C. Performance of Duties by Surveillance Team Members

Generally, a case agent, *i.e.*, an NCIS special agent in charge of a specific investigation, requests surveillance support for that investigation. Tr. 297:1-23, 318:9-21 (Freeman). The case agent will specify the target and objectives. Tr. 55:1-6, 73-13 to 74:16 (Shea), 298:8-12, 318:9-21 (Freeman). Most of these missions are considered sensitive to national security. Tr. 146:6-11 (Shea); *see also generally* JX 1 at 1 (describing duties and requirements).

Once the Surveillance Team receives and accepts a surveillance request, the Supervisor assigns one member as the Team Leader. Tr. 298:13-23, 299:7-23 (Freeman); *see also* PX 25 (showing team leaders for missions between January 2015 and June 2018).[6] Mr. Freeman would assign a team leader based on experience, character, and mission complexity, "only giv[ing] it to [those] who . . . had proven . . . that they would be able to handle team lead." Tr. 300:1-24 (Freeman). Mr. Freeman would also seek to keep the same Team Leader for different operations in support of the same mission. Tr. 299:11-23 (Freeman).

Despite the seeming mandatory requirement for GS-12 Investigation Specialists to serve as a team leader, *see* JX 1 at 3 ("will serve"), practice indicates otherwise. Mr. Freeman considered the position voluntary and several GS-12 Investigations Specialists did not serve as Team Leader, Tr. 314:24 to 315:12, 346:8 to 347:1 (Freeman),[7] while a GS-11, Mr. George Ester, did serve as Team Leader, *see* Tr. 411:14-20 (Ester) (promotion dates), 415:13-20 (Ester) (Team Leader dates).[8] From July 2014, "five or six" team members would rotate through Team

---

[6]The testimony regarding Team Leader duties reflected differences in perception of the Team Leader's duties and how the Team Leader should function when all team members are equal in grade and position description. For example, testimony diverged not about the contents of the operations plan for missions generally, but rather over the significance of the plan. *Compare* Tr. 80:8-18 (Shea) (describing it as "boilerplate."), *with* Tr. at 323:1-5 (Freeman) (finding it provides significant information).

[7]The Surveillance Team's Standard Operating Procedures, dated April 12, 2017, also describes the Team Leader position as "ideally, voluntary in nature." Def.'s Ex. ("DX") 2 § 3-2. It was uncertain, however, whether the version produced at trial was a final approved text or still in draft form. Tr. 355:8-22 (Freeman); 463:11 to 464:7 (Sevigny).

[8]Mr. Ester was promoted to GS-12 around November 2018, Tr. 411:14-20 (Ester), but first served as a Team Leader in September 2018, Tr. 415:13-20 (Ester).

Leader, Tr. 86:21 to 87:2 (Shea), although currently only three team members do: Mr. Shea, Ms. Sevigny, and Mr. Ester.  Tr. 86:12-17 (Shea).

Once assigned, the Team Leader would speak with the case agent "to get the particulars" of the operation, such as the dates, locations, objectives, and targets for the requested surveillance.  Tr. 79:5 to 80:1, 83:21 to 84:9 (Shea).   The Team Leader would also determine how many team members were available to participate, Tr. 80:1-6 (Shea), 302:10-18 (Freeman), though generally, all available Surveillance Team members participated in operations, *see* Tr. 49:22 to 50:1 (Shea).  The Team Leader would also designate an Assistant Team Leader, Tr. 302:10-18 (Freeman), and a notetaker, Tr. 118:2-7 (Shea), 306:5-10 (Freeman).  The Team Leader would then prepare an Operations Plan, a classified written document that describes the surveillance operation, how it will be executed, which team members will participate, where and when it will occur, and any other relevant requirements.  Tr. 302:10-18 (Freeman); *see also* Tr. 80:8-18 (Shea); DX 2 at 50-56 (sample Operations Plan).  Mr. Shea and Ms. Sevigny, another Surveillance Team member who has served as Team Leader, described the Operations Plan as a short document, perhaps two pages, that is "basically [] boilerplate" and takes 10 minutes to complete.  Tr. 80:8-20 (Shea); Tr. 481:13-21, 492:23 to 493:17 (Sevigny).  Before a mission, a team Leader would "mak[e] sure [the team] knew where they have to be, when they have to be there, what gear they have to have . . . [and generally] make sure they actually know what they're doing."  Tr. 303:11-16 (Freeman).  The Team Leader might also check with team members about whether any pending administrative issues were being addressed prior to departing on an operation.  Tr. 303:7-16, 352:15-23 (Freeman).

During a surveillance operation, the Team Leader would set up an initial on-site meeting and would coordinate roles for team members.  Tr. 82:1-16 (Shea).  The Team Leader would also arrange for the conduct of an initial assessment of key areas from which to watch the target.  Tr. 60:24 to 61:7, 122:5-10 (Shea).  The Team Leader would act as the point of contact for the case agent, passing information from the case agent to the Surveillance Team as necessary.  Tr. 82:6-8 (Shea).  The Team Leader would decide methods of surveillance in the event of disagreement among the team or for "minor, little twists," Tr. 123:22 to 125:5 (Shea), although for decisions that may be "detrimental to the case," the Team Leader would first check with the case agent, Tr. 124:5 to 125:2 (Shea).  Mr. Freeman described the Team Leader as the "officer in charge . . . while that [operation] is going on, [who] has the ground truth [and] the line of sight view of everything that's happening," and agreed that a Team Leader is "responsible for directing all aspects of the surveillance operation."  Tr. 323:17 to 324:16 (Freeman).  The Team Leader also serves as a point of contact between the Supervisor and the other team members.  *E.g.*, Tr. 306:1-4 (Freeman).  When the Supervisor was not participating on an operation, the Team Leader would check-in with the Supervisor generally once a day.  Tr. 150:10-22 (Shea); Tr. 316:3-7 (Freeman).

When conducting an operation, all Surveillance Team members including the Team Leader will follow assigned targets in accordance with the surveillance objectives provided by the case agent.  Tr. 82:14 to 83:20 (Shea).  The team uses a variety of tactics and standard commercially-available equipment to surveil assigned targets, coordinate their own movements, and record observations.  Tr. 53:6 to 57:23 (Shea) (equipment), 60:10 to 64:22 (Shea) (tactics), 443:22 to 444:14 (Ester) (equipment), 479:22 to 480:13 (Sevigny) (tactics).  Surveillance may occur on foot or by vehicles, may employ electronic means, and may have aerial support.  Tr.

479:22 to 480:7 (Sevigny). Surveillance Team members are trained to remain inconspicuous. Tr. 314:1-18 (Shea), 438:5-14, 448:24-25 (Ester), 474:3 to 475:25 (Sevigny). They must use their discretion and judgment in deciding how best to cover a target while evading detection, which includes decisions regarding where to position themselves and how closely or for how long to follow a target. Tr. 158:6 to 159:24 (Shea), 491:16-25 (Sevigny). Although Surveillance Team members receive formal training, Tr. 73:8-12 (Shea), 437:18 to 438:4 (Ester), experience and informal training by colleagues allow members to hone existing skills and gain additional ones, Tr. at 441:12 to 444:17 (Ester), 471:22-25 (Sevigny).

Upon returning from a surveillance operation, team members participate in an after-action briefing led by the Supervisor, where the team critiques their execution of the operation. Tr. 75:11-77:5 (Shea), 436:18-23 (Ester). The notetaker prepares an Investigative Action Report, a narrative summary of the operation. Tr. 77:6-25 (Shea), 483:1-4 (Sevigny). After review by the Supervisor, the Investigative Action Report is passed to the case agent. Tr. 78:1-8 (Shea). The Team Leader is not required to approve the Investigative Action Report, Tr. 84:21-25, 127:2-8 (Shea), but often reviews it before submission, Tr. 151:3-7 (Shea) ("Seventy percent of the time."). Ms. Sevigny, as a collateral duty, reviews the Investigative Action Report. Tr. 497:8-14 (Sevigny). The Team Leader also prepares a separate short report for the Consolidated Law Enforcement Operation Center, although this task can be delegated to the notetaker. Tr. 317:14 to 318:8 (Freeman).

When not in the field conducting surveillance or in the office conducting pre- and post-operation activities, Surveillance Team members may complete training, maintain their equipment, and look for better equipment or develop new tactics. Tr. 88:10-21 (Shea), 437:13-17 (Ester).

### D. Mr. Shea's Role on the Surveillance Team

Mr. Shea's joined NCIS in 2007 after a 22-year career as a police officer and detective. Tr. 41:7-23 (Shea). Mr. Shea first served as a supervisor in the Liaison Section of the Records Management Branch. Tr. 41:22 to 42:2 (Shea). In May 2010, Mr. Shea joined the Surveillance Team as a GS-12 Investigations Specialist. Tr. 42:3-10 (Shea); Joint Stip. ¶ 2. Mr. Shea remains a GS-12. Tr. 42:9-10 (Shea). As with other Investigations Specialists on the Surveillance Team, Mr. Shea conducts surveillance in support of NCIS counterintelligence investigations. Tr. 42:25 to 43:10 (Shea).

NCIS issued Mr. Shea equipment to use in conducting surveillance missions. Tr. 53:6-10 (Shea) (detailing personal equipment). Mr. Shea's standard equipment consists of a monocular,[9] two "regular off-the-shelf digital cameras," a 12-volt charging device, two standard cell phones with push-to-talk and team member tracking applications, and a standard FM radio. Tr. at 53:16 to 54:14, 55:21 (Shea). The other Surveillance Team member have similar equipment. Tr. 55:21 to 56:4 (Shea). Additionally, if required for the mission, Mr. Shea may take a larger 35-watt radio to communicate with aviation assets or a video recording device that can be concealed within a vehicle. Tr. 56:5 to 57:14 (Shea). Mr. Shea has a collateral duty of managing the

---

[9]Mr. Shea described the monocular as "a round cylindrical tube . . . sort of like a binocular, but it's smaller." Tr. 53:17-18 (Shea).

team's FM radios, and has provided informal training to the team on using communication devices or other equipment. Tr. 89:2 to 90:25 (Shea), 306:11-23 (Freeman).

Mr. Freeman felt comfortable assigning Mr. Shea as Team Leader to any type of mission, as he believes that Mr. Shea is "a good team lead," Tr. 300:25 to 301:13 (Freeman), and noting that case agents "liked the way he would handle things," Tr. 301:25 to 302:3 (Freeman). Accordingly, Mr. Shea served as a Team Leader on a number of occasions. Mr. Freeman estimated that between October 2013 and September 2014, Mr. Shea served as team lead on 4 or 5 of 22 surveillance operations. Joint Stip. ¶ 7; Tr. 336:6-14 (Freeman). Between January 2015 and June 2018, Mr. Shea served as Team Leader for 13 to 18 of 59 operations. PX 25; Tr. at 343:24 to 344:7 (Freeman), 465:1-6 (Sevigny), 501:6 to 502:16 (Shea) (questioning five assignments). Mr. Shea also served as the notetaker on approximately "10 to 20 percent" of operations. Tr. 78:15-18 (Shea).

NCIS has classified Mr. Shea as exempt from the Fair Labor Standards Act since he became a GS-12 Investigations Specialist in 2010. Joint Stip. ¶¶ 2, 6. Mr. Shea's job description exists in an outdated format, based on the previously applicable National Security Personnel System that focused on a narrative description of the position's duties rather than a description that relies on a time-based breakdown of the position's duties. Tr. 253:6 to 254:15 (Cruz). Mr. Shea has worked overtime hours since at least July 2014, during which time he has received AUO at the rate of 25% of his base salary instead of overtime under the Fair Labor Standards Act. Joint Stip. ¶¶ 3-5. Between July 2014 and September 2018, Mr. Shea worked nearly 2,573 overtime hours, for which he received an additional $98,991.02 in AUO. PX 4 at 6.[10]

The government has represented that Mr. Shea has been reclassified non-exempt as of December 10, 2018, pursuant to a policy decision to treat all Investigations Specialists equally after this court approved a settlement agreement in a related case to reclassify two other GS-12 Investigations Specialists as non-exempt. Tr. 30:7 to 32:5; *see Sevigny v. United States*, No. 18-734C, Pl.'s Notice of Acceptance of Offer of Judgment, ECF No. 12.[11]

## PROCEDURAL HISTORY

Mr. Shea filed suit in this court on July 1, 2016, alleging that NCIS deprived him of overtime and premium pay when it erroneously classified him as exempt from the Fair Labor Standards Act. *See generally* Compl. In September and October 2017, the parties cross-moved for summary judgment on issues of liability, disputing whether Mr. Shea falls within the administrative exemption, and if so, whether the misclassification was done in good faith and

---

[10]PX 4 indicates that for three months in early 2018, Mr. Shea received AUO at 20%. Mr. Shea, however, calculates his overtime pay for this period as if he had received 25%, PX 4 at 5-6, and the parties have agreed that Mr. Shea received 25% AUO since July 2014, Joint Stip. ¶ 5. Accordingly, the court adopts the amount of $98,991.02 as reflected in PX 4.

[11]Apart from Mr. Shea, Surveillance Team members will receive compensation dating back to December 10, 2016, as if they had been re-classified as non-exempt at that time. Tr. 34:19 to 38:11.

with a reasonable basis, or represented a "willful violation." *Shea*, 136 Fed. Cl. at 95, 97-98. On January 31, 2018, the court granted partial summary judgment in favor of the government, concluding that Mr. Shea had not shown that NCIS acted willfully in the event that it had incorrectly classified Mr. Shea. *Id.* at 113.[12] The court denied summary judgment for both parties on the issues of whether NCIS classified Mr. Shea correctly and whether the exempt classification, if in error, had a reasonable basis and was made in good faith. *Id.* at 114.

The two-day trial began on December 17, 2018. A week before trial commenced, Mr. Shea moved to compel the government to produce an unredacted version of a draft position description for GS-12 Investigations Specialists and for related communications. Pl.'s Mot. to Compel Produc. of Docs. Improperly Redacted as Privileged ("Pl.'s Mot. to Compel"), at 1, ECF No. 41. This revised position description has not yet been implemented, and the government avers that it is protected by the work-product doctrine and attorney-client privilege on the ground that it was created at the direction of counsel "in consideration of possible settlement." Def.'s Opp'n to Pl.'s Mot. to Compel ("Def.'s Opp'n"), at 1-3, ECF No. 42. The court's post-trial scheduling order deferred ruling on Mr. Shea's motion to compel until the post-trial decision and requested the parties to address in their post-trial briefs whether the issue remained relevant in light of testimony received at trial. *See* Post-Trial Scheduling Order & Order Deferring Ruling on Pl.'s Mot. to Compel ("Post-Trial Order"), ECF No. 48.

## STANDARDS FOR DECISION

### A. *Employee Classification under the Fair Labor Standards Act*

Pursuant to the Fair Labor Standards Act, an employer must pay an employee for work in excess of 40 hours per week at a rate not less than one and one-half times the employee's regular rate. *See* 29 U.S.C. § 207(a). This overtime pay requirement applies to civilian employees of the federal government. *See* 29 U.S.C. § 203(d), (e)(2). But the Fair Labor Standards Act carves out a number of exemptions, to include "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1), or a "criminal investigator who is paid availability pay under section 5545a of title 5," 29 U.S.C. § 213(a)(16), (b)(3).

OPM implements the requirements of the Fair Labor Standards Act as applied to most federal employees, to include civilian employees of NCIS. *See* 29 U.S.C. § 204(f); 5 C.F.R. § 551.102(a). OPM's regulations presume that every employee is covered by the Fair Labor Standards Act "unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of the exemptions [to the FLSA]." 5 C.F.R. § 551.202(a). The Fair Labor Standards Act does not define the administrative exemption, but OPM's regulations consider a federal employee to be exempt under the administrative exemption when the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations, as distinguished from production functions, of the employer or the employer's customers and whose primary duty includes the exercise of

---

[12]The court's ruling on willfulness triggered a two-year rather than a three-year statute of limitation, which limits Mr. Shea to damages incurred beginning on July 1, 2014. *See* 29 U.S.C. § 255(a).

discretion and independent judgment with respect to matters of significance." 5 C.F.R. § 551.206.

The burden to prove an exemption "rests with the agency." 5 C.F.R. § 551.202(c); *see also Berg v. Newman*, 982 F.2d 500, 503 (Fed. Cir. 1992). The agency's determination "must ultimately rest on the duties actually performed by the employee," 5 C.F.R. § 551.202(e), and "may be based on a combination of functions, no one of which constitutes the primary duty," 5 C.F.R. § 551.202(h). Further, an agency has no discretion in classifying employees; rather, the "agency must designate an employee [as] exempt" if the employee meets the requirements, 5 C.F.R. § 551.202(a), (d), but if reasonable doubt exists, the agency must designate the employee as non-exempt, 5 C.F.R. § 551.202(d).

"OPM's administration of the Act must be consistent with the Department of Labor's administration of the Act only to the extent practicable and [if] consistency is required to maintain compliance." 5 C.F.R. § 551.101(c); *see also Billings v. United States*, 322 F.3d 1328, 1334 (Fed. Cir. 2003). OPM, however, considers its "executive, administrative, and professional exemption criteria [to be] consistent with the Department of Labor's exemption criteria." 5 C.F.R. § 551.101(c).

## B. Compensation Under the Fair Labor Standards Act

"Any employer who violates [Section 207] shall be liable to the employee . . . [for the] unpaid overtime compensation . . . and [for] an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The court may, however, limit or deny liquidated damages "if the employer shows to the satisfaction of the court that . . . [the employer acted] in good faith and . . . had reasonable grounds for believing that [its] act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C. § 260. A prevailing plaintiff is also entitled to "a reasonable attorney's fee . . . and costs." 29 U.S.C. § 216(b). The federal government may be held liable under these standards. 29 U.S.C. § 216(b).

The employee must bring suit within two years of the accrual of the cause of action, or within three years if the employer's violation was "willful." 29 U.S.C. § 255(a).

## ANALYSIS

### A. Liability

Mr. Shea is presumed to fall under the Fair Labor Standard Act's overtime pay provision unless the government can show otherwise. *See, e.g.*, 5 C.F.R. § 551.202(a), (c). The government argues that Mr. Shea's role, as a "senior level Investigations Specialist[], particularly [when] leading and directing the [Surveillance Team], . . . meets the criteria for the administrative exemption." Def.'s Br. at 2. The government does not argue the applicability of any other exemption, such as the executive, professional, or criminal investigator exemptions. *See generally* Def.'s Br.

A prerequisite to applying the administrative exemption is identifying Mr. Shea's primary duty. *See* 5 C.F.R. § 551.206. "[D]esignation . . . must ultimately rest on the duties actually performed." 5 C.F.R. § 551.202(e). In the absence of a primary duty, however, an "exemption

may be based on a combination of functions, no one of which constitutes the primary duty."  5 C.F.R. § 551.202(h).

    *1.  Mr. Shea's primary duty.*

    The government characterizes Mr. Shea's primary duty as "managing the [Surveillance Team] in its execution of surveillance operations."  Def.'s Br. at 1-2.  Though careful not to characterize Mr. Shea's primary duty as being Team Leader, the government nonetheless draws particular attention to Mr. Shea's performance when acting as Team Leader.  *Compare id.* at 4-12, 16-22 (discussing Mr. Shea's duties when Team Leader), *with id.* at 13-14, 22-23 (discussing duties when not Team Leader); *see also id.* at 28 ("Mr. Shea's primary duty . . . is managing the surveillance team on surveillance missions."); 10 (quoting Tr. 130:8-17 (Shea) (As Team Leader, "it's my neck that's on the line.")).

    The government argues that Mr. Shea, as a senior Investigations Specialist, serves as Team Leader during more than a third of the time devoted to surveillance operations, Tr. 562:3-10 (government's closing argument), and plays a significant role in operations that constitute the Surveillance Team's functions during most other times, Def.'s Br. at 3, 5.  Further, the government contends that Mr. Shea does not need to spend a majority of his time as Team Leader for surveillance management to be his primary duty, so long as management "constituted a substantial, regular part of his work."  *Id.* at 21.

    Mr. Shea contends that his primary duty is "performing surveillance."  Pl.'s Br. at 12.  Although Mr. Shea concedes he has served as Team Leader on "approximately one quarter of missions," *id.* at 1, Mr. Shea argues that even when serving a Team Leader, "90% to 95% of [this] time [is] doing the same surveillance work as the rest of the team members," *id.* at 6.  Accordingly, Mr. Shea calculates that he only spends at most "2.5% of his [total] time on team lead duties."  *Id.* at 6.  And while Mr. Shea also concedes that a primary duty does not need to occupy the majority of his time, Mr. Shea contests the government's alternative argument by averring that the government offered no evidence that his position exists to perform management functions, and that the exemption of the position is at least debatable.  *Id.* at 16-17.

    A primary duty "typically means the duty that constitutes the major part (over 50 percent) of an employee's work."  5 C.F.R. § 551.104 (defining "primary duty").

    According to the government's revised calculations, Mr. Shea spent 37% of his total work hours during 2015 performing Team Leader duties.  *See* Tr. 562:3-10; *see also* Pl.'s Reply at 2 & n.1 (proposing adjustments to the government's calculations at Def.'s Br. at 20, based on PXs 3, 4).  Accepting the government's assumptions underlying the 37% figure, Mr. Shea did not spend the majority of his time in 2015 as Team Leader.[13]

---

[13]The evidence lacks detailed support for the government's assumption that for each operation, pre-operational planning required between 16 and 40 hours and post-mission activities occupied eight hours.  *See* Def.'s Br. at 18-20.  Testimony indicated that pre-operational activities specific to a Team Leader included preparing an Operations Plan, which took minutes, and meetings with the case agent for an unspecified duration.  *E.g.*, Tr. 79:5 to 80:24 (Shea).

The government does not replicate these calculations for the other years at issue, though the evidence would permit it to do so for 2016, 2017, and half of 2018.  The government, however, suggests implicitly that 2015 may be the high point for Mr. Shea's time serving as Team Leader.  *See* Def.'s Br. at 20.  In 2016, Mr. Shea served as Team Leader for three of 17 deployments, and in 2017, Mr. Shea served as Team Leader for three or four of 15 operations.  *See* PX 25; *see also* Tr. 342:3-19 (Freeman), 465:1-6 (Sevigny) (indicating Ms. Sevigny was Team Leader for both Cold Whisper operations), 501:11-17 (Shea) (stating he was not Team Leader for the Poly Support mission).  In the first six months of 2018, Mr. Shea was Team Leader on three of eight operations.  PX 25.  None of the operations on which Mr. Shea served as Team Leader after 2015 appeared unusually long when compared to the others.  *See* PX 25.  The government explains that "periods . . . during which Mr. Shea did not spend 50% of his time serving as team lead" resulted not from a change of his duties, but an overall slowdown in missions.  Def.'s Br. at 20 (citing Tr. 171:3-9 (Shea), 332:4-16 (Freeman)).  Days conducting field operations appeared to decline from perhaps 70% in 2015 to 40-50% by 2017.  Tr. 332:4-16 (Freeman).  Even so, the government's explanation, albeit reasonable, cannot change the fact that the evidence fails to show that Mr. Shea spent more than 50% of his time as a Team Leader.

Considering the government's broad categorization of Mr. Shea's primary duty, Mr. Shea's other non-Team Leader managerial duties could supplement his Team Leader duties.  In this respect, however, the government adduces insufficient evidence of how Mr. Shea manages or coordinates the work of the surveillance team when not the Team Leader or how much time Mr. Shea spends conducting such other management or coordination.[14]  There is no detailed evidence, for example, that in 2015 Mr. Shea spent significant work hours performing non-Team Leader aspects of "managing" execution of surveillance operations.  *See* JX 1 at 3.  And, the government did not identify any particular operations for which Mr. Shea was a "de facto" Team Leader, nor whether such instances were omitted from NCIS's list of Team Leaders for each operation.  Tr. 320:16-25 (Freeman).  Absent such details, the court cannot find that that these

---

Other necessary actions included ensuring that all members of the surveillance team were available and prepared.  Tr. 80:1-6 (Shea).  Post operation, the Team Leader would be involved in preparation of post-operation reports and in an after-action briefing.  *E.g.*, Tr. 318:22 to 319:16 (Freeman).  Time spent on either was not established.  Accordingly, the court finds that 37% of hours in 2015 spent as Team Leader represents a rough approximation of an upper bound.

[14]The government submits that Mr. Shea "imparts his expertise to junior team members," Def.'s Br. at 5, specifying that he periodically helps other team members with their equipment or answers general questions about administration or surveillance tactics.  *Id*. at 14 (citing Tr. 320:5-15 (Freeman)).  The government also suggests that even when not Team Leader, Mr. Shea would sometimes act as "de facto team lead for [an operation]."  *Id*. at 21 (quoting Tr. 320:16-25 (Freeman)).  The Investigations Specialist position description mentions managing information in support of investigations, planning "logistical and operational aspects of physical surveillance," coordinating training, remaining current with surveillance trade craft, and preparing reports regarding resources, productivity, or activities.  JX 1 at 3.  And indeed, Mr. Shea does research changes to surveillance technology and tactics, especially with respect to communication equipment.  Def.'s Br. at 13 (citing JX 1 and Tr. 324:21 to 326:6 (Freeman), 437:13-17 (Ester), & 26.

other duties, to the extent they constitute management or coordination, occupy sufficient time to constitute more than half of Mr. Shea's duty when added to Mr. Shea's Team Lead duties.

Management, according to OPM, refers to making personnel decisions, such as those involving hiring, firing, discipline, promotions, or performance evaluations. 5 C.F.R. § 551.104 (defining "Management"). But no evidence suggests that Mr. Shea makes personnel decisions or has such duties. Tr. 462:4-18 (Sevigny) (suggesting the opposite). Management could also encompass budget or purchasing decisions, maintaining financial records, or handling grievances. 5 C.F.R. § 551.104. Here, however, no evidence suggests that Mr. Shea makes budget or purchasing decisions, maintains financial records, handles grievances, or has any other such duties. Management also refers to training employees, directing or apportioning employee work, planning work, determining work techniques, or monitoring or implementing legal compliance measures. 5 C.F.R. § 551.104 (defining "Management"). No evidence suggests that Mr. Shea's primary duty, when not the Team Leader, is to plan operations, direct team members, apportion their work, or monitor their compliance with laws, although he does have a role in determining what techniques or tools other team members will use. Indeed, Mr. Shea has provided on-the-job training to new members on surveillance tactics and training to team members on new electronic equipment pursuant to a collateral duty. Tr. 89:21 to 90:17; 211:13-213:13 (Shea). Yet, the informal and infrequent nature of the training precludes finding this role as an exercise of management of the Surveillance Team. Evidence does not show that Mr. Shea has prepared reports regarding resources, productivity, or activities. Tr. 349:12-20 (Freeman). Rather, to the extent these management activities occur outside a field operation, the Surveillance Team Supervisor performs this role. Tr. 160:6-12 (training); 213:14-20 (preparing statistical, operational, and administrative reports) (Shea).

When a "duty constitute[s] less than 50 percent of an employee's work," that duty may nonetheless be considered as primary if the government shows that the duty constitutes (1) "a substantial, regular part of the work," (2) "the reason for the existence of the position," and (3) is "clearly exempt" considering the "basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment . . . , and the significance of the decisions made." 5 C.F.R. § 551.104 (defining "Primary duty").

The government, however, has not demonstrated that Mr. Shea's particular position exists to manage the Surveillance Team in execution of surveillance operations. All Surveillance Team members are GS-12 Investigation Specialists. Tr. 35:17-19; 87:10-11; 132:18-19 (Shea). All GS-12 Investigations Specialists on the Surveillance Team have the same position description. Tr. 348:17 to 349:5 (Freeman). And "[o]fficially, there's no hierarchy" among the Surveillance team. Tr. 305:18-24 (Freeman). Thus, Mr. Shea's position cannot be said to exist to manage execution of operations when Mr. Shea occupies a position and grade identical to those he supposedly manages. NCIS classifies positions, not people. Tr. 365:11-366:11 (Cruz). Further, Mr. Shea serves as one of several Team Leaders, and serving as Team Leader apparently is optional, even for a GS-12 Investigations Specialist. Tr. 314:24 to 315:12, 346:8 to 347:1 (Freeman). An optional duty, by definition, cannot be a reason for the position's existence. And since serving as Team Leader is the only duty that implicates management of operational execution, Mr. Shea's position does not exist to manage the Surveillance Team in its execution of surveillance operations. Because the government has not established that Mr. Shea's position exists to manage execution of surveillance operations, the court need not, and does not, address

whether Team Leader duties by themselves, if performed by an Investigations Specialist more than 50 percent of the times, are "clearly exempt work" within the meaning of 5 C.F.R. § 551.104.

In sum, the government cannot establish either that Mr. Shea spent more than 50 percent of his time managing execution of surveillance operations or that Mr. Shea's position exists to manage execution of surveillance operations. Thus, Mr. Shea's primary duty was not to manage the surveillance team while also performing surveillance. Rather, his primary duty was to perform surveillance while also managing team members when periodically assigned as Team Leader.

### 2. Application of the administrative exemption to Mr. Shea.

To qualify under the administrative exemption, the government must show that Mr. Shea's primary duty, or a combination of duties, (1) involves "performance of office or non-manual work" (2) "directly related to the management or general business operations, as distinguished from production functions, of the employer," and (3) "includes the exercise of discretion and independent judgment with respect to matters of significance." 5 C.F.R. § 551.206; *see also* 29 C.F.R. § 541.200.

In general, the "duties Mr. Shea performs when he is acting as a line Investigations Specialist – *i.e.*, not serving as team lead," fail to meet the criteria for the administrative exemption. *Shea*, 136 Fed. Cl. at 110 (discussing the "management or general business operations" element). Nevertheless, an exemption "may be based on a combination of functions, no one of which constitutes the primary duty." 5 C.F.R. § 551.202(h).[15] Accordingly, the court considers whether Mr. Shea's role as an Investigations Specialist who operates at the position's full performance level, when viewed in its entirety, contains sufficient exempt functions that, when combined, would require NCIS to classify Mr. Shea as exempt. In other words, does Mr. Shea's performance as Team Leader, when combined with non-Team Leader aspects of his performance as a GS-12 Investigations Specialist, suffice such that he qualifies for the administrative exemption.

The government applies the administrative exemption to Mr. Shea's "role of managing the [Surveillance Team] on surveillance operation[s]" and "manag[ing] the members of a specialized team conducting surveillance operations." Def.'s Br. at 26. Besides Mr. Shea's performance as Team Leader, the government also adduced testimony about non-Team Leader functions of Surveillance Team members, namely that Investigations Specialists "look for better equipment to improve [their] capabilities." *Id*. at 30-31 (quoting Tr. 437:13-17 (Ester)). The government also notes that because of his experience, Mr. Shea "provides expertise to team members." *Id*. at 14.

Mr. Shea contests this amalgam, arguing that his "[primary] duty of performing surveillance relates to NCIS's 'production function' rather than its 'management or business operations.'" Pl.'s Br. at 12. Mr. Shea offers several cases where employees serving in positions

---

[15]Several duties that would qualify for different exemptions may also be combined, and one duty may invoke aspects of different exemptions. 5 C.F.R. § 551.202(h).

akin to Team Leader were nonetheless found to be non-exempt, as well as the Department of Labor's regulations suggesting that a "surveillance worker who 'directs the work other employees' in performing surveillance," like Mr. Shea when Team Leader, is non-exempt. *Id*. at 17-18 (citing 29 C.F.R. § 541.3(b)(2)). Mr. Shea also briefly contests whether tactical surveillance decisions constitute a sufficient exercise of discretion because they "involve applying 'well-established techniques'" and training. *Id*. at 21 (quoting 5 C.F.R. § 551.206(e)). Further, Mr. Shea notes that little of his work occurs at a desk. *Id*.

     (a) *Office or non-manual work.*

"[O]ffice or non-manual work" is undefined by OPM regulations, though Department of Labor regulations suggest manual work "involves repetitive operations with [] hands, physical skill[,] and energy," where employees "gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.3(a). The Department of Labor's regulations correlatively give examples of non-management "production-line," "maintenance," and "construction" employees. 29 C.F.R. § 541.3(a). A plain-language meaning would counsel similar functions. *See Shea*, 136 Fed. Cl. at 111 n.15 (defining "manual labor").

Mr. Shea's duties satisfy this first prong. During the period at issue, Mr. Shea spent approximately 20% to 60% of his work days in the office. *E.g.*, Tr. 170:8 to 171:4 (Shea), 332:13-16 (Freeman). In the office, a Surveillance Team Investigations Specialist prepared reports of, or plans for, surveillance operations, completed mandatory training, attended meetings with case agents about surveillance missions, and checked their equipment. Tr. 88:10-21 (Shea), 437:13-17 (Ester). During operations, while team members would often be on foot, surveillance required exercise of tactical judgment, such as knowing how close to follow a target, where to set up and when to adjust positions, and when to back-off a target. Tr. 60:19 to 64:22, 69:12 to 72:22 (Shea). Surveillance Team members must adapt constantly to the target's actions and their environment. Tr. 196:9 to 197:21 (Shea), 477:4-14 (Sevigny). All members receive specialized training. Tr. 73:6-12 (Shea). The position description does not identify physical skill or stamina as a prerequisite. *See* JX 1 at 2. The Team Leader also exercises some direction over the conduct of the surveillance operation. Tr. 323:17 to 324:16 (Freeman). Therefore, while conducting surveillance may have physical aspects, most of value added by an Investigations Specialist is not from performing repetitive operations or exerting physical energy. Rather, an Investigation Specialist imparts value to NCIS by exercising significant mental acuity to surveil a target, discern and adapt to the target's actions, and remain undetected.

     (b) *Management or general business operations.*

OPM's regulations do not define expressly when duties are "directly related to the management or general business operations, as distinguished from production functions." 5 C.F.R. § 551.206. OPM's regulations do, however, define management duties as, among others, those as involving making personnel employment decisions, planning or apportioning work, and monitoring and supervising employees. *See* 5 C.F.R. § 551.104 (defining "Management). And OPM's regulations distinguish "management or general business operations" from "production functions." 5 C.F.R. § 551.206. OPM's administrative exemption aligns with that that of the

Department of Labor, *see* 5 C.F.R. § 551.101(c); *see also Billings*, 322 F.3d at 1334, and the Department of Labor's regulations expressly define the phrase as "work directly related to assisting with the running or servicing of the business," 29 C.F.R. § 541.201(a).

Mr. Shea's duties, on the whole, fail to satisfy the second prong. NCIS's mission is to conduct criminal and counterintelligence investigations. *E.g.*, JX 1; Joint Stip. ¶ 1, Tr. 275:4-23 (Cruz). The production function of the agency would be conducting those investigations. *See* Tr. 266:15-23, 275:4-20 (Cruz). Mr. Shea's role, when not Team Leader, is to produce information about investigation targets by conducting surveillance. The administrative work that Mr. Shea or other Investigation Specialists perform when not Team Leader are ancillary to this production function and distinguishable from managing NCIS or general operations of the agency.

The government suggests that providing training to team members and maintaining equipment constitute management or general business operations. The court disagrees. Maintaining personal equipment by Investigations Specialists does not appear "directly related to assisting with the running or servicing of" NCIS. It is too ancillary to the Investigations Specialist's production function. Nor does it fall within or closely relate to any of the examples of management provided by OPM's or the Department of Labor's regulations. *See* 5 C.F.R. § 551.104; 29 C.F.R. § 541.201(b). Training is mentioned in the regulations, but given the context in which Mr. Shea provides it, the court finds it outside of the definition of management. The evidence shows that Mr. Shea has provided informal training as a collateral duty on a specific topic, *i.e.*, use of communication devices, to Investigations Specialists. Tr. 89:15 to 90:17 (Shea). He may impart his expertise to junior members of the team, but this training also appears informal. There is also evidence that team members may provide opinions about surveillance tactics, techniques, and procedures, such as during after-action meetings. Tr. 319:3 to 320:4 (Freeman). But, a production employee does not convert himself into a manager by making performance suggestions. Mr. Shea has not been shown to possess discretion to modify policy, and his concurrence, or lack thereof, to policy changes has not been shown to be extensive enough to be accorded substantial weight.

Team Leader duties may implicate management or general business operations, but the court need not resolve the issue. Team Leader is not Mr. Shea's primary duty under either primary duty test, and thus cannot provide an independent basis for applying the exemption to him. And since non-Team Leader duties do not constitute management or general business operations in any appreciable manner, they do not help to bridge the gap.[16]

(c) *Exercise of discretion or independent judgment.*

To determine whether an employee's duties "include[] the exercise of discretion and independent judgment with respect to matters of significance," the court considers several factors

---

[16]If the court were to credit the training provided by Mr. Shea as an exempted management function, the evidence regarding the significance of the duty in terms of time or Mr. Shea's overall function is still too sparse to find that it, along with Team Leader, would suffice to invoke the administrative exemption.

against the totality of the facts of the "particular employment situation." 5 C.F.R. § 551.206. These factors include, among others, whether the employee "[h]as authority to formulate, affect, interpret, or implement management policies or operating practices," "[h]as authority to waive or deviate from established policies or procedures without prior approval," "[c]arries out major assignments in conducting the operations of the organization," "[p]erforms work that affects the organization's operations to a substantial degree," and "[i]s involved in planning long- or short-term organizational objectives." 5 C.F.R. § 551.206(b).[17]  The employee needs to be "free from immediate direction or supervision" or review to satisfy this prong, but can be reviewed at a higher level. 5 C.F.R. § 551.206(c).  Nevertheless, Mr. Shea's duties, on the whole, fail to satisfy the third prong.

The government identifies only one non-Team Leader function to demonstrate discretion and independent judgment: "look[ing] for better equipment." Def.'s Br. at 30-31. This function, while no doubt important, does not align with any of the factors identified by OPM's regulations. Further, there is no evidence that Mr. Shea, having identified better equipment, could independently decide to acquire new equipment for himself or other Investigations Specialists.

Other evidence of activities that arguably could demonstrate discretion and independent judgment when not acting as Team Leader include critiquing operations during after-action briefings and making or assisting in making the numerous tactical decisions while conducting surveillance. Those tactical decisions provide more discretion and require more judgment than Mr. Shea acknowledges. It is imprecise to say that the Surveillance Team's actions are "dictated by the target's actions." Tr. 126:9-10 (Shea). The target is usually unaware of the team. Rather, a team member responds to the target based on individual judgment, as informed by experience and training. This discretion and judgment, however, fails to suffice with respect to matters of significance. Surveillance Team operations contribute to important investigations. But while judgments over the course of an operation may aggregate into having a substantial effect on the operation, any one individual tactical action might not have a perceptible effect and even the cumulative decisions in one surveillance operation might not affect NCIS's operations, as a whole, to a substantial degree. In any event, the exercise of discretion and judgment is not a team member's primary duty, nor even a major duty. Rather, as tactical decisions, they are ancillary to conducting surveillance, the objectives of which are ultimately determined by another. To sum, the discretion and judgment exercised by a team member becomes too attenuated by the time it affects NCIS to have a substantial effect on the agency's operations.

There is no evidence to indicate that the Surveillance Team is involved in planning *organizational* objectives, *i.e.*, the overall objectives of NCIS. The evidence is to the contrary; the Surveillance Team only affects individual investigations and only upon request by the case agent. *See* Tr. 108:15-25 (Shea), 297:11-23 (Freeman). Even operational objectives are determined external to the team. Tr. 73:13 to 74:16 (Shea) (determined by the case agent), 297:11-23 (Freeman) ("comes in from another office"). There is no evidence that the Surveillance Team may deviate from NCIS policies or procedures without approval or that they have authority to alter those policies or practices. At most, they may make suggestions to their

---

[17]Although 10 enumerated, non-inclusive factors are listed in the regulation, the five cited factors seem closest to functions performed by an Investigations Specialist.

Supervisor, an ability endemic to every employee, and thus these actions are insufficient to indicate discretion or judgment as to matters of significance.

A Team Leader may demonstrate a greater degree of discretion and judgment than would a team member.  But, similar to the discussion of management or general business operations, the court would have to identify sufficient non-Team Leader duties that implicate discretion or judgment to supplement the Team Leader role.  It cannot.  Accordingly, the discretion and judgment exercised by Mr. Shea fails to satisfy the third administrative exemption prong.

The Department of Labor's regulations also support this outcome.  The administrative exemption "do[es] not apply to . . . investigators . . . and similar employees, regardless of rank or pay level, who perform work such as . . . preventing or detecting crimes; conducting investigations . . . for violations of law; performing surveillance; . . . preparing investigative reports; or other similar work."  29 C.F.R. § 541.3(b)(1).  Such employees are not exempt even if they direct the work of others "because their primary duty is not the performance of work directly relate to the management or general business operations of the employer."  29 CFR § 541.3(b)(3).  Mr. Shea's primary duty is neither to manage the surveillance team nor does it related to the general operation of NCIS, and his surveillance duties fall squarely within those described by 29 C.F.R. § 541.3(b)(1).[18]  And since Mr. Shea's primary duty is not management of the surveillance team, the government's reliance on *Benavides v. City of Austin*, No. 11-cv-438, 2013 WL 3197636 (W.D. Texas June 20, 2013), cannot help distinguish Mr. Shea's duties from those in either 29 C.F.R. § 541.3(b) or the precedents cited by Mr. Shea.  *See* Def.'s Br. at 28.[19]

---

[18]Although Mr. Shea is not designated by NCIS as a criminal investigator or counterintelligence investigator, *see* Def.'s Br. at 28-29 (citing Tr. 107:22 to 108:6 (Shea)), the court does not accept the government's implicit assumption that 29 C.F.R. § 541.3 uses "investigators" in a specialized meaning confined to criminal investigators or counterintelligence investigators, *see* Def.'s Br. at 29 (discussing Section 541.3, stating "Mr. Shea is not an investigator").  Thus, a position labeled as an "*Investigations* Specialist" that supports investigations by conducting surveillance would come within the common usage of the term.  Elsewhere, the regulations use "investigators" when discussing public sector employees engaged in, among other areas, fire prevention, construction, health, or sanitation.  29 C.F.R. § 541.203(j).  Further, even adopting the constrained definition suggested by the government, the regulation covers investigators or "similar employees."  29 C.F.R. § 541.3.  Surveillance directly supports investigations, and surveillance is an investigative technique, *see surveillance*, Black's Law Dictionary (10th ed. 2014) ("gathering evidence"); *see also investigation*, *id*. ("activity of trying to find out the truth about something, such as a crime . . .").  Thus, *Investigations* Specialists on the *Surveillance* Team are "similar employees" to criminal or counterintelligence investigators.  And, as implied by the position and confirmed by the evidence, they conduct surveillance.

[19]In *Benavides*, a jury found that the primary duty of Emergency Medical Services Department Field Commanders was management or constituted office or non-manual work.  *Benavides*, 2013 WL 3197636, at *4.  Field Commanders, unlike their subordinates, were dispatched to only certain emergencies and had discretion to take themselves out of service when an ambulance arrived or to self-assign to calls.  *Id.* at *7.  The Field Commanders also performed

### 3. *The related exemption for criminal investigators.*

The Fair Labor Standards Act exempts a "criminal investigator" who receives availability pay under 5 U.S.C. § 5545a. 29 U.S.C. § 213(a)(16), (b)(30). Title 5 requires a "criminal investigator" to be a law enforcement officer, *see* 5 U.S.C. § 5545a(a)(2), which Mr. Shea is not. Mr. Shea also received AUO, not availability pay. Joint Stip. ¶ 5.

### 4. *Summary*

Mr. Shea's primary duty is not to manage the surveillance team during operations. Rather, his primary duty is conducting surveillance in support of criminal and counterintelligence investigations, which would not qualify for the administrative exemption. Mr. Shea does at times exercise direction over surveillance team members when acting as Team Leader, but because this is not his primary duty, it cannot independently bring him under the administrative exemption even if these duties are exempt. The court need not reach whether Team Leader duties would qualify Mr. Shea for the administrative exemption because his non-Team Leader duties are insufficient to supplement any exempt Team Leader functions to qualify him for the exemption. Accordingly, NCIS erred by classifying Mr. Shea as exempt from the Fair Labor Standards Act and by capping his overtime pay at 25% of his basic pay regardless of whether his overtime hours exceeded 25%.

## B. Damages

### 1. *Compensatory damages & measure of back pay.*

Mr. Shea seeks $73,139.41 in back pay from July 2014 through September 2018 and unspecified back-pay at a similar rate from October 2018. Pl.'s Br. at 22-23. Mr. Shea contends that he is entitled to the difference between time-and-one-half based on his hourly pay over 40 hours per week and the AUO he received, which for the specified period would reflect $172,130.43 reduced by $98,991.02, or $73,139.41. *Id.* at 22; *see also* PX 4 at 6 (overtime pay computation). The government contends that if Mr. Shea is non-exempt, his recovery should be $42,750.84, which reflects OPM's "bump-up" method for calculating hourly overtime pay for an employee receiving AUO. Def.'s Br. at 36; *see also* 5 C.F.R. § 551.512(b). Mr. Shea argues against using OPM's bump-up method because NCIS policy is to not leave a non-exempt

---

"non-medical duties, such as coordinating resources among emergency-response agencies, directing incoming vehicles and personnel, and arranging for patient transportation." *Id.* Field Commanders, when not responding to calls, ensured "crews are available and ready," "have received adequate training," and "have access to functional and adequate medical [resources]." *Id.* at *8. Field Commanders also evaluated performance, responded to complaints, maintained personal records, initiated discipline, inspected their crews, and made recommendations on promotions. *Id.* The court found "Field Commanders engage in many of the activities listed as management in [29 C.F.R. §§ 541.102, 541.201(b)]," that these "were not merely performed concurrently with 'front-line' first-responder work," but constituted "significant management and administrative work separate and apart from the supervisory work they may do [when responding to calls]," and thus met the administrative exemption criteria even if they also provided emergency medical treatment. *Id.* at *9-10.

employee on AUO.  Pl.'s Br. at 22-23; *see also* Tr. 263:2-9 (Cruz).  The government responds that because Mr. Shea received AUO during the relevant period, he would fit squarely within OPM's guidance regardless of NCIS's discretionary decision to not pay AUO to non-exempt employees.  Def.'s Br. at 36.  The parties do not dispute the calculation of compensatory damages under each method, only which methodology applies.

The court agrees with the government.  Although NCIS opts not to place non-exempt employees on AUO for policy reasons, Tr. 263:2-9 (Cruz), OPM's regulations permit non-exempt employees to receive AUO, *see* 5 C.F.R. § 551.512(b).  And NCIS did pay Mr. Shea AUO.  Joint Stip. ¶ 5.  Thus, as a non-exempt employee who received AUO, Mr. Shea's overtime compensation while receiving AUO would have reflected the bump-up as calculated using the methodology of 5 C.F.R. § 551.512(b).

### 2. *Liquidated damages.*

Mr. Shea argues entitlement to liquidated damages because liquidated damages is the standard and because the government failed to show either that it took active steps to verify its classification decision or why it made the decision.  Pl.'s Br. at 23-28.  Mr. Shea argues that NCIS's recent attempt to justify the exemption was based on an unreasonable interpretation of OPM's regulations and on a position description lacking essential information.  *Id*. at 27-28.  Mr. Shea also notes that NCIS has made other classification errors and recently decided to reclassify as non-exempt other GS-12 Investigations Specialists on his team.  *Id*. at 28-29.

The government contends that NCIS acted reasonably in relying on the position description as the basis for classification, and that, on the whole, the duties within the description are characterized by "autonomy, responsibility, and leadership."  Def.'s Br. at 32.  The government also notes that NCIS's performance management system requires annual review of the position description, while isolated errors involving other grades are neither indicative of overall unreasonableness nor relevant to Mr. Shea's classification.  *Id*. at 33.  And, NCIS recognized the need to compensate Mr. Shea above his base salary for overtime work even if it applied the wrong overtime standard.  *Id*. at 34-35.

"Any employer who violates [Section 207] shall be liable to the employee . . . [for] liquidated damages" in an amount equal to the compensatory damages.  29 U.S.C. § 216(b).  The court may, however, limit or deny liquidated damages "if the employer shows to the satisfaction of the court that . . . [the employer acted] in good faith and . . . had reasonable grounds for believing that [its] act or omissions was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.  The "burden to show reasonable basis and good faith rests with the government."  *Shea*, 136 Fed. Cl. at 113 (citing *Bull v. United States*, 479 F.3d 1365, 1379 (Fed. Cir. 2007), and *Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995)).

An employer acts in "good faith" when it demonstrates an "honest intention to ascertain what the [Fair Labor Standards Act] requires."  *Shea*, 136 Fed. Cl. at 113 (quoting *Kinney v. District of Columbia*, 994 F.2d 6, 12 (D.C. Cir. 1993)).  Good faith is a subjective showing.  *E.g.*, *Martin v. United States*, 130 Fed. Cl. 578, 585 (2017).  In contrast, the "reasonable grounds" prong requires that the employer has an objectively reasonable basis for its classification decision.  *E.g.*, *Martin*, 130 Fed. Cl. at 585; *Bull v. United States*, 68 Fed. Cl. 212, 229 (2005),

*aff'd*, 479 F.3d 1365.  "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous."  *Bull*, 68 Fed. Cl. at 229 (quoting *Beebe v. United States*, 640 F.2d 1283, 1295 (Ct. Cl. 1981)).

NCIS has shown sufficiently that its erroneous classification was done in good faith.  The question is not whether any one employee failed to take active steps, but whether the employer failed to do so.  NCIS demonstrated an intent to comply with the Fair Labor Standards Act by having a formal process to classify positions and review decisions, executed by a dedicated staff. Tr. 228:22 to 229:9, 362:22 to 363:21, 364:2-19 (Cruz).  The classification determination for each position is based on review of a written description of duties, Tr. 229:7-14 (Cruz), a description that agency supervisors are required to review annually and a verification process that is built into the performance evaluation system, Tr. 226:22 to 227:24 (Cruz).  While NCIS had not reanalyzed the classification prior to Mr. Shea's suit, the duties upon which the classification was based, as documented in the position description, had not changed.  Tr. 228:1-4 (Cruz); *see also* JX 1.  And while Mr. Freeman testified that he did not recall a process by which the position description was reviewed annually, Tr. 350:3-23 (Freeman), he also felt the description remained accurate, Tr. 321:6 to 326:6 (Freeman), and particularly examined the position description upon request in 2017, Tr. 350:12-23 (Freeman), while making new hires, Tr. 359:1-6 (Freeman), and during his annual evaluation of Mr. Shea, Tr. 359:7-11 (Freeman).

The court further finds that NCIS's decision, though in error, had objectively reasonable grounds.  NCIS relied on Mr. Shea's written position description when classifying his position as exempt.  *See* Tr. 228:22 to 229:24, 233:14-20 (Cruz).  The position description contains duties that could be interpreted as falling within the administrative exemption, namely that a senior Investigations Specialist "will serve as the team leader during physical surveillance operations [and be] responsible for directing all aspects of the surveillance operations, to include directing team members."  JX 1 at 3.  The fact that serving as Team Leader is optional and that it does not constitute a primary duty, key considerations in finding that Mr. Shea was wrongly classified, required extensive factual discovery and testimony on Team Leader assignments and Mr. Shea's actual duties.  The court finds nothing inherently unreasonable about relying on a process consisting of documenting duties in a description and having a supervisor validate them annually.  The court further does not accept Mr. Shea's argument that 5 C.F.R. § 551.202(e) "bar[s] any [such] conclusion."  Pl.'s Br. at 27.  While 5 C.F.R. § 551.202(e) does require that "designation of an employee as FLSA exempt or nonexempt must ultimately rest on the duties actually performed," NCIS satisfied this requirement for the purpose of objectively reasonable grounds by implementing a process intended to ensure compliance.

Mr. Shea points to several other errors or admissions as further evidence that NCIS lacks objectively reasonable grounds for its classification error.  NCIS erred in classifying at least one other Investigations Specialist.  Pl.'s Br. at 27-28.  While true, this person performed at a lower, entry-level grade and under a different position description.  *See* Tr. 411:7 to 415:12 (Ester); PX 21 at 1 (showing exempt while a GS-7).  Accordingly, that error has minimal bearing on Mr. Shea's misclassification.

Mr. Shea also cites to several concessions by Ms. Cruz.  Ms. Cruz initially indicated that an employee's performance of production work supported an exempt classification and then later

acknowledged that this interpretation was in error. Pl.'s Br. at 27 (citing Tr. 275:24 to 276:5, 375:21 to 376:9 (Cruz)). Mr. Shea also contends that Ms. Cruz did not read OPM decisions finding that NCIS criminal investigators, as employees engaged in production work, were non-exempt. *Id.* at 28; Tr. 270:18 to 271:12 (Cruz). These oversights, however, do not evidence that Mr. Shea's position description failed to provide objectively reasonable ground for an exempt decision. Mr. Shea's position description does indicate work beyond production function. As noted, it was evidence of his actual duties and that of comparable team members that supported a finding of non-exempt. Further, Mr. Shea's argument that Ms. Cruz did not find records of the original classification decision, Pl.'s Br. at 27, fails to consider the rest of her testimony, namely where she did look, Tr. 255:3-8 (Cruz) ("I have gone through a share[d] [computer] drive.").

Mr. Shea also attacks NCIS's reliance on a position description presented in a format that excludes a specification of time assigned to various duties, Pl.'s Br. at 27, *i.e.*, the National Security Personnel System format, *see* Tr. 376:10-18 (Cruz). While NCIS stopped using the now-outdated National Security Personnel System format in 2010 and currently creates position descriptions that indicate the percentage of time spent on duties, NCIS was not required to convert existing position descriptions from the National Security Personnel System format into the new format. Tr. 377:16-18 (Cruz). Thus, there is nothing inherently unreasonably about NCIS's continued use of it even if NCIS is in the process of revising the description.

Further, the court does not accept Mr. Shea's argument that NCIS's decision to reclassify other Investigations Specialists on the Surveillance Team bears on liquidated damages. *See* Pl.'s Br. at 29. This reclassification, which will be extended to Mr. Shea, occurred immediately before the trial and pursuant to similar pending litigation. Tr. 34:5-7. That senior management made the decision without consulting Ms. Cruz, Tr. 386:24 to 389:9 (Cruz), also has little bearing upon whether NCIS's classification of Mr. Shea was reasonable when made and does not indicate that NCIS "is willing to disregard its own internal processes." Pl.'s Br. at 29. NCIS need not hold its position to the last, casting a blind eye to possible error, to maintain its reasonable ground defense. Instead, remedying an error is inadmissible to prove culpability. *See* Fed. R. Evid. 407 (evidence of subsequent remedial measures not admissible to prove "culpable conduct"). And contrary to Mr. Shea's rebuttal, *see* Pl.'s Reply at 17-18, his arguments regarding the reclassification decision do bear on culpability. They are offered to undermine whether NCIS had objectively reasonable grounds for its classification decision, and thus are improper.

The court also disagrees that the redacted draft position description bears on liquidated damages. *See* Pl.'s Br. at 30. The court accepts the declaration by NCIS's counsel that he requested the revised position description for the purposes of pursuing settlement. *See* Def.'s Opp'n at 1; *see also id.* Attach. 1 ("Mullins Decl."). As such, the position description is covered by the work-product doctrine and Mr. Shea has not shown a compelling need for production. Mr. Shea has not shown why the information within the draft position could not be adduced via testimony. Nor has Mr. Shea shown how it would bear upon liquidated damages. At most, it would show that at a time subsequent to the denial of summary judgment to the government and before trial, NCIS realized its description of duties or its exemption classification was in error. But error alone cannot undermine the government's reasonable grounds defense. The relevant inquiry is whether NCIS had reasonable grounds when it classified the position, maintained the classification, or relied on the position description for those decisions. This draft position

description cannot address those issues. And contrary to Mr. Shea's assertions, Ms. Cruz's testimony does not contradict the government's position. *See* Pl.'s Br. at 30 (citing Tr. 280:25 to 281:5 (Cruz)). Ms. Cruz, when asked about the GS-7 and GS-9 classifications, indicated that sometime after March 2018 NCIS formed a working group to rewrite position descriptions and convert them from the National Security Personnel System format. Tr. 279:15 to 280:2 (Cruz). While Ms. Cruz testified that the working group proposing changes was not convened in response to this litigation, the working group was examining all positions under the 1801 and 1810 occupational codes, indicating wider scope than the Surveillance Team. Tr. 281:3-25 (Cruz). Further, Mr. Lynes, Branch Head of the NCIS Human Resources Operations and Services Division, was asked by counsel to draft the revised position description, *see* Def.'s Opp'n at 2, and Ms. Cruz testified that she was neither part of that process nor briefed by Mr. Lynes, Tr. 282:1-15 (Cruz). Mr. Shea's motion to compel production of the draft position description is DENIED.

## CONCLUSION

For the reasons stated, the court finds that NCIS erred by classifying Mr. Shea as exempt. The measure of compensatory damages should reflect OPM's procedure for calculating overtime pay for an employee receiving premium pay. NCIS's classification decision, though erroneous, evidenced a reasonable basis and was done in good faith. Accordingly, Mr. Shea is awarded $42,750.84 in back pay for the period July 2014 through September 2018, and an amount to be calculated using the same methodology for October 2018 until Mr. Shea has been paid overtime that accounts for his non-exempt status.[20]

There being no just reason for delay, the court directs the clerk to enter final judgment respecting damages pursuant to RCFC 54(b). Pursuant to RCFC 54(d), Mr. Shea may apply for an award of reasonable costs and reasonable fees for witnesses and attorneys under 29 U.S.C. §

---

[20]Mr. Shea's request to reconsider the grant of summary judgment to the government on willfulness is denied. Pl.'s Br. at 30-34; *see also Shea*, 136 Fed. Cl. at 113. To prevail, Mr. Shea had to show that NCIS knew it had erroneously classified him or showed reckless disregard for determining whether its conduct was legal. *Id.* According to OPM's regulations, reckless disregard exists when an agency fails "to make adequate inquiry into whether conduct [complies] with the Act," 5 C.F.R. § 551.104, but the employer's actions must be more than unreasonable, *Shea*, 136 Fed. Cl. at 113 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 & n.13 (1988)). Mr. Shea has adduced no new evidence regarding whether NCIS knowingly misclassified Mr. Shea or knowingly kept him misclassified. The evidence produced at trial shows that NCIS erred in its classification decision, but NCIS cannot be said to have acted recklessly, considering the reasons provided for finding it acted upon reasonable grounds and in good faith. And while Mr. Shea raised overtime pay concerns, NCIS's response was correct even if based on an erroneous classification decision; Mr. Shea was ineligible because he was exempt and received AUO. Perhaps Mr. Shea's inquiry should have triggered a greater inquiry by NCIS, but the evidence does not show that NCIS's failure stemmed from conscious indifference to the Act. Even though NCIS cannot now locate records to support its basis in 2009 for classifying the position as exempt, the burden is on Mr. Shea to prove NCIS erred willfully at some point since 2009, and not on the government to prove it did not.

216(b).  Proceedings related to any such request shall be deferred until after any appellate process has been concluded or, alternatively, after the time for taking an appeal has expired.

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Senior Judge